RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0241p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────

A. PHILIP RANDOLPH INSTITUTE; NORTHEAST OHIO
COALITION FOR THE HOMELESS; LARRY HARMON,
         *Plaintiffs-Appellants*,

   *v.*

JON HUSTED, Secretary of State,
         *Defendant-Appellee*.

No. 16-3746

─────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:16-cv-00303—George C. Smith, District Judge.

Argued: July 27, 2016

Decided and Filed: September 23, 2016

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Stuart C. Naifeh, DĒMOS, New York, New York, for Appellants. Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Stuart C. Naifeh, Naila Awan, DĒMOS, New York, New York, Freda J. Levenson, Elizabeth Bonham, ACLU OF OHIO, Cleveland, Ohio, Richard Saphire, UNIVERSITY OF DAYTON SCHOOL OF LAW, Dayton, Ohio, Paul Moke, WILMINGTON COLLEGE, Wilmington, Ohio, for Appellants. Michael J. Hendershot, Eric E. Murphy, Steven T. Voigt, Jordan S. Berman, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. Tovah R. Calderon, Vikram Swaruup, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Emmet J. Bondurant, BONDURANT MIXSON & ELMORE LLP, Atlanta, Georgia, Michelle E. Kanter Cohen, PROJECT VOTE, INC., Washington, D.C., Lauren M. Burke, JUDICIAL WATCH, INC., Washington, D.C., for Amici Curiae.

1

CLAY, J., delivered the opinion of the court in which GIBBONS, J., joined, and SILER, J., joined in part.  SILER, J. (pp. 22–25), delivered a separate opinion concurring in part and dissenting in part.

───────────────

**OPINION**

───────────────

CLAY, Circuit Judge.  The A. Philip Randolph Institute ("APRI"), the Northeast Ohio Coalition for the Homeless ("NEOCH"), and Larry Harmon (collectively "Plaintiffs") filed suit seeking to enjoin the defendant, Ohio Secretary of State Jon Husted ("the Secretary"), from removing the names of registered voters from Ohio's voter rolls pursuant to the state's so-called Supplemental Process, which Plaintiffs allege violates the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 20901 *et seq.*  Plaintiffs also sought an injunction requiring the Secretary either to reinstate otherwise eligible voters who were improperly removed from the rolls pursuant to the Supplemental Process, or to count provisional ballots cast by such persons.  Finally, Plaintiffs alleged that the change-of-address confirmation notices mailed to voters as part of the Supplemental Process fail to meet the standards for such notices set out in the NVRA, 52 U.S.C. § 20507(d)(2).  Before us is Plaintiffs' appeal from the district court's order denying Plaintiffs' request for a permanent injunction and directing entry of judgment in favor of the Secretary.  For the reasons set forth below, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

**Factual History**

In addition to maintaining procedures for removing the names of the deceased, those who have been adjudicated incompetent, and convicted felons from its voter rolls, *see* Ohio Rev. Code § 3503.18(A)–(C), Ohio utilizes two processes for identifying and purging from the rolls voters who are no longer eligible to vote because they have moved outside their county of

registration. *See* Ohio Rev. Code § 3503.21.[1]  The first is Ohio's "NCOA Process," under which the Secretary's office compares the names and addresses contained in Ohio's Statewide Voter Registration Database to the National Change of Address ("NCOA") database.  "The NCOA database contains names and addresses of individuals who have filed changes of address with the United States Postal Service."  (R. 38-2, Damschroder Decl., ¶ 11.)  The Secretary thereafter provides each county's Board of Elections ("BOE") with a list of voters registered therein who appear to have moved, based on the comparison of the two databases.  The BOEs then "send[] a confirmation notice . . . to each individual identified."  (*Id.*)  That notice is a postage prepaid forwardable form on which the voter must indicate whether he or she still lives at the same address.  Recipients of the notice are removed from the rolls if they: (1) do not respond to the confirmation notice or update their registration; *and* (2) do not subsequently vote during a period of four consecutive years that includes two federal elections.[2]  *See* Ohio Rev. Code § 3503.21(A)(7), (B).

Ohio's so-called "Supplemental Process" is the second method the state uses for identifying and removing from the rolls voters who are no longer eligible to vote due to a change of residence.  The Supplemental Process is largely identical to the NCOA Process, except in the way it begins: rather than identifying voters who may have moved by reference to the NCOA database, each county's BOE compiles a list of registered voters who have not engaged in any "voter activity" for two years.  For the purposes of the Supplemental Process, "voter activity" includes "filing a change of address" with a designated state agency; "filing a voter registration card with the [BOE]; . . . casting an absentee ballot; casting a provisional ballot; [or] voting on election day."[3]  (R. 42-1, Damschroder Dep., PageID 1548–49.)  After compiling a list of inactive voters, each BOE sends a confirmation notice to those on its list.  As with the NCOA

---

[1]Both processes are performed on an annual basis.  *See* Ohio Rev. Code § 3503.21(D).

[2]As discussed below, the NCOA Process mirrors the voter roll maintenance procedure outlined in Section 8, subsection (c) of the NVRA.  *See* 52 U.S.C. § 20507(c).  Because that subsection describes the NCOA Process as one way in which states "may" comply with their obligation under the NVRA to identify and remove voters who are no longer eligible due to a change of residence, *see* 52 U.S.C. § 20507(a)(4) and (c), the NCOA Process is sometimes referred to in this litigation as the "Safe-Harbor Process."

[3]According to the Secretary, BOEs carrying out the Supplemental Process "also have discretion to consider whether signing a candidate, issue, or local option petition is viewed as voter activity."  (R. 38, Def.'s Merits Br., PageID 257.)

Process, voters sent a confirmation notice are removed from the rolls if they subsequently fail to vote for four years and fail to either respond to the notice or re-register. In sum, under the Supplemental Process, a voter is purged from the rolls after six years of inactivity—even if he or she did not move and otherwise remains eligible to vote.

When this litigation began, the confirmation notices sent to voters pursuant to both the NCOA Process and Supplemental Process required that voters provide their name, current Ohio address, date of birth, and either their Ohio driver's license number, their Social Security number, or a copy of a document verifying their identity and address. The notices required that voters provide such information regardless of whether they had changed address or were merely confirming that they still lived at the same address. Moreover, the notices did not adequately inform voters of the consequences of failing to respond to the notice; rather, the form indicated that the recipient's registration "may" be canceled if he or she did not respond, re-register, or vote in the next four years. (R. 42-13, 2015 Conf. Notice Form, PageID 1702.) Finally, the form failed to inform voters who had moved outside of Ohio on how they could remain eligible to vote in their new state.

As discussed below, the Secretary issued a new confirmation notice form during the pendency of this litigation. On the newly issued form, voters can confirm that they have not changed address by simply signing, dating, and returning the postage prepaid form. The new form also provides voters with the dates by which they must either return the form or vote in order to remain registered. Notably, however, the new form still lacks information on how persons who have moved to another state can register to vote in their new state.

**Procedural History**

This case began with two letters sent by NEOCH and APRI to the Secretary in December 2015 and February 2016, respectively. Both letters asserted that Ohio's Supplemental Process violated Section 8 of the NVRA. Not long after sending their letters, APRI and NEOCH representatives began meeting with the Secretary in an attempt to resolve their concerns without litigation. Those meetings failed to produce results, causing Plaintiffs to file this suit in federal district court on April 6, 2016. Plaintiffs' complaint alleged two causes of action relevant to this

appeal: first, that the Supplemental Process unlawfully removes registered voters from the rolls due to their failure to vote in violation of Section 8, subsection (b)(2) of the NVRA, 52 U.S.C. § 20507(b)(2); and second, that the confirmation notices sent to voters under both the NCOA Process and the Supplemental Process fail to meet the standards for such forms set out in the NVRA, 52 U.S.C. § 20507(d)(2).

The day after filing their complaint, Plaintiffs moved for a temporary restraining order ("TRO") prohibiting the Secretary from "removing eligible Ohio voters from the voter rolls on account of their failure to vote pursuant to Ohio's 'Supplemental Process.'" (R. 9, Mot. for TRO, PageID 36.) Plaintiffs' motion also requested a preliminary injunction compelling the Secretary to reinstate voters already removed from the rolls pursuant to the Supplemental Process. Four days later, Plaintiffs agreed to withdraw their request for a TRO in exchange for the Secretary's agreement not to initiate the Supplemental Process prior to July 1, 2016. A week after Plaintiffs filed their complaint, the parties agreed to engage in limited discovery and to address all the dispositive issues in the case through simultaneous briefing. The parties filed their briefs in May and June of 2016, with Plaintiffs styling their briefs as memoranda supporting motions for summary judgment and a preliminary injunction. On June 17, 2016—the day the parties' final briefs were due before the district court—the Secretary issued a directive requiring BOEs to use a new version of the confirmation notice form. As discussed above, that new form corrected all but one of Plaintiffs' alleged deficiencies.

On June 29, 2016, the district court issued an order denying Plaintiffs' motions for summary judgment and a preliminary injunction; the order directed entry of judgment in favor of the Secretary. Addressing the parties' arguments under permanent injunction standards, the court began by rejecting Plaintiffs' arguments that the Supplemental Process violates the NVRA and the HAVA. The court held that because Section 8 of the NVRA does not explicitly dictate what information states may or must use as a "trigger" for sending a confirmation notice, that decision was impliedly left to the states. The court also concluded that the Supplemental Process does not violate the NVRA and the HAVA's prohibition on removing voters from the rolls solely by reason of their failure to vote because such removal occurs only after a voter has failed to vote *and* failed to respond to a confirmation notice.

Turning to the Plaintiffs' arguments regarding the legality of Ohio's confirmation notice form, the district court first noted the Secretary's promise that his newly issued form would be used during the upcoming voter roll purges. Relying on that promise, the court held that the Secretary's voluntary cessation of illegal activity was sufficient to moot Plaintiffs' challenges to the confirmation notice form. Finally, the court rejected Plaintiffs' argument that the newly issued form still violated 52 U.S.C. § 20507(d)(2)(B) by failing to provide those who have moved out of Ohio with information on how to stay registered. The court held that this argument was waived because Plaintiffs' briefing failed to raise the argument, and that the argument failed on the merits in any event because it "defies logic" that the NVRA would require local registrars to "coach" voters on how to register in a different state. (R. 66, Order, PageID 23025.) Thus having rejected all of Plaintiffs' arguments on the merits, the district court held that no preliminary injunction was warranted and that judgment should be entered for the Secretary.[4] Plaintiffs filed their notice of appeal the following day.

## DISCUSSION

### Standard of Review

The parties agree that there are no disputes regarding the facts recounted above, and that the district court's denial of Plaintiffs' request for an injunction was based solely on its interpretation of the NVRA and the HAVA. "When reviewing the decision of a district court to grant or to deny a request for issuance of a permanent injunction, . . . legal conclusions are reviewed de novo." *Sec'y of Labor, U.S. Dep't of Labor v. 3Re.com, Inc.*, 317 F.3d 534, 537 (6th Cir. 2003) (internal quotation marks omitted); *see also Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006) ("[S]tatutory interpretation questions are issues of law, which we review de novo."). We also review de novo the district court's conclusion that some of Plaintiffs' claims are now moot. *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 530 (6th Cir. 2001).

---

[4]Absent from this summary of the holdings in the district court's order is discussion of Plaintiffs' claim that Ohio's Supplemental Process is applied in a non-uniform manner in violation of 52 U.S.C. § 20507(b)(1). The district court rejected that claim, and Plaintiffs' briefing on appeal does not address it. We therefore conclude that the claim is forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

**Analysis**

**I.        Plaintiffs' Challenge to Ohio's Supplemental Process**

Congress' stated purposes in enacting the NVRA were, *inter alia*, "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office; . . . [and] to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). "These purposes counterpose two general, sometimes conflicting, mandates: To expand and simplify voter registration processes so that more individuals register and participate in federal elections, while simultaneously ensuring that voter lists include only eligible . . . voters." *Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1274 (D. Colo. 2010). Those sometimes conflicting mandates are reflected in the language of Section 8 of the NVRA, 52 U.S.C. § 20507, which is where our analysis must begin. *See Lewis v. United States*, 445 U.S. 55, 60 (1980) ("[I]n any case concerning the interpretation of a statute the 'starting point' must be the language of the statute itself."). Importantly, Section 8's language pairs the mandate that states maintain accurate voter rolls with multiple constraints on how the states may go about doing so.

Those constraints begin with subsection (a) of Section 8, which states that "[i]n the administration of voter registration for elections for Federal office, each State shall . . . provide that the name of a registrant *may not* be removed from the official list of eligible voters *except*" under certain circumstances. 52 U.S.C. § 20507(a)(3) (emphasis added); *see also* S. Rep. No. 103-6, at 19 (1993) ("[O]ne of the guiding principles of [the NVRA is] to ensure that once registered, a voter remains on the rolls so long as he or she is eligible to vote in that jurisdiction."); H.R. Rep. No. 103-9, at 18 (1993). The Act then provides an exhaustive list of circumstances justifying removal: "criminal conviction or mental incapacity as provided by state law, the death of the registrant, or . . . a change of the registrant's residence." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 376 (6th Cir. 2008) (citing 42 U.S.C. § 1973gg-6(a)(3)–(4), now codified as 52 U.S.C. § 20507(a)(3)–(4)). This case concerns the final circumstance justifying removal—change of residence—which is subject to its own mandate and accompanying constraints. Subsection (a)(4) of Section 8 requires that states "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of

eligible voters by reason of . . . a change in the residence of the registrant;" the Act thereafter specifies that any such program must be conducted "in accordance with subsections (b), (c), and (d)." 52 U.S.C. § 20507(a)(4)(B).

Subsection (b) provides two additional constraints on states' discretion. First, all roll maintenance procedures must "be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 *et seq.*)." *Id.* § 20507(b)(1). Second, and more pertinent to this appeal, subsection (b)(2) provides that roll maintenance procedures "shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote." *Id.* § 20507(b)(2). This language from subsection (b)(2) was later modified by the HAVA, which appended the following clause to the general prohibition on removal by reason of failure to vote:

> . . . except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual--
>
> > **(A)** has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then
> >
> > **(B)** has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

*Id.* By the HAVA's own terms, however, this language is not to "be construed to authorize or require conduct prohibited under . . . or to supersede, restrict, or limit the application of . . . [the NVRA]." *Id.* § 21145(a); *see also* H.R. Rep. 107-329, at 37 (2001) (indicating that under the HAVA, "removal of those deemed ineligible must be done in a manner consistent with the [NVRA]. The procedures established by NVRA that guard against removal of eligible registrants remain in effect under this law. Accordingly, [the HAVA] leaves NVRA intact, and does not undermine it in any way.").

Subsections (c) and (d) of Section 8 provide two final constraints on states' roll maintenance procedures. First, subsection (c)(2)(A) provides that "any program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters" must be completed "not later than 90 days prior to the date of a primary or general

election for Federal office."  52 U.S.C. § 20507(c)(2)(A).  Second, subsection (d)(1) establishes that states "*shall not* remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence" without first subjecting the registrant to the confirmation notice procedure outlined in that subsection.  *Id.* § 20507(d)(1) (emphasis added).  That mandatory confirmation notice procedure is the one described above as the final step of Ohio's NCOA Process and Supplemental Process: a forwardable postage prepaid and pre-addressed form is sent to a voter, and the voter is removed from the rolls if (1) he or she does not respond to the confirmation notice or update his or her registration, *and* (2) he or she does not subsequently vote during a period of four consecutive years that includes two federal elections.  *See id.* § 20507(d).

Finally, we note that in subsection (c)(1) of Section 8, Congress provided states with an example of a procedure for identifying and removing voters who had changed residence that would comply with the NVRA's mandates and accompanying constraints.  That subsection provides that "[a] State *may* meet the requirement of subsection (a)(4) by establishing a program under which" voters who appear to have moved based on information contained in the NCOA database are sent subsection (d) confirmation notices.  *See id.* § 20507(d)(1) (emphasis added). The parties do not dispute that Ohio's NCOA Process mirrors this so-called "safe-harbor" procedure and that the NCOA Process is thus permissible under the NVRA.

The focus of this case, therefore, is Ohio's Supplemental Process.  Specifically, Plaintiffs argue that the Supplemental Process violates the clause of subsection (b)(2)—hereinafter referred to as the "prohibition clause"—prohibiting roll maintenance processes that "result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote."  *Id*. § 20507(b)(2).  The Secretary responds that the Supplemental Process is permitted by the exception to subsection (b)(2)'s prohibition clause added by the HAVA—hereinafter referred to as the "except clause"—which states: ". . . except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d)."  *Id.*  The legality of Ohio's Supplemental Process can therefore be boiled down to two questions: whether the Process is expressly

permitted by subsection (b)(2)'s except clause; and, if not, whether the Supplemental Process violates that subsection's prohibition clause.

### A.     The Supplemental Process is not expressly permitted by subsection (b)(2)'s except clause

Turning to the first operative question, it bears repeating that the Supplemental Process fully incorporates subsection (d)'s confirmation notice procedure. Certainly, under the except clause's plain language, such incorporation is permissible even though the confirmation notice procedure itself involves consideration of a registrant's failure to vote. *See id.* § 20507(b)(2) and (d)(1)(B)(ii). But that conclusion does not end our inquiry—the Supplemental Process does not *only* employ subsection (d)'s confirmation notice procedure. Rather, under the Supplemental Process, the confirmation notice procedure is "triggered" by a registrant's failure to engage in any "voter activity" for two years. We must therefore determine whether that trigger provision should be analyzed separately from the confirmation notice procedure, such that the trigger is subject to the prohibition clause; or, in the alternative, whether the Supplemental Process' incorporation of the confirmation notice procedure means that the entire Process—including the trigger—is permitted under the except clause.

The Secretary advocates for the second of these two positions. He states, for example, that "[t]he language that a cancellation 'shall not result' from a 'failure to vote' 'except' when coupled with the failure to 'respond[]' to an address-confirmation inquiry authorizes the Ohio Supplemental Process." (Def.'s Br. at 27 (emphasis omitted); *see also id.* at 41.) The operative language in this argument is the phrase "when coupled with," by which the Secretary implies that a process resulting in removal by reason of failure to vote is nevertheless permitted by the except clause so long as it is "coupled with" the procedures outlined in subsection (d). We note, however, that neither the phrase "when coupled with," nor any comparable language, appears in the except clause's text.[5] *See* 52 U.S.C. § 20507(b)(2). The Secretary's argument is therefore

---

[5]In a similar vein, the Secretary asserts that the except clause "authorizes removals that follow the procedures in subsections (c) and (d)." (Def.'s Br. at 27 (emphasis omitted).) This argument again adds language to the except clause, which does not authorize all "*removals that follow* the procedures in subsections (c) and (d)" (*id.* (emphasis added)); rather, the clause simply permits states to "us[e] the procedures" in those subsections. *See* 52 U.S.C. § 20507(b)(2).

flawed insofar as it requires us to "read[] a phrase into the statute when Congress has left it out." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).

Moreover, the Secretary's reading of the except clause would require us to ignore the traditional rule of statutory construction dictating that exceptions to a statute's general rules be construed narrowly. *Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 739 (1989) ("In construing [statutes] in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision."); *Detroit Edison Co. v. Sec. & Exch. Comm'n*, 119 F.2d 730, 739 (6th Cir. 1941) ("Provisos and exceptions in statutes must be strictly construed and limited to objects fairly within their terms, since they are intended to restrain or except that which would otherwise be within the scope of the general language."); *see also* 2A Norman J. Singer, *Statutes and Statutory Construction* § 47:11, at 246–47 (6th ed. 2000) ("Subsidiary clauses which limit the generality of a rule are narrowly construed, as they are considered exceptions."). Contrary to that general rule, the Secretary would have us adopt an expansive interpretation of the except clause under which states can not only "us[e] the procedures described in subsections (c) and (d)," 52 U.S.C. § 20507(b)(2); rather, under the Secretary's interpretation, use of those procedures would render states' processes completely immune to the general rule that the except clause modifies. We decline to adopt this interpretation, and instead err on the side of giving maximum effect to the prohibition clause's general rule. *See, e.g.*, Singer, *supra*, § 47:11, at 250–51 ("[W]here a general provision in a statute has certain limited exceptions, all doubts should be resolved in favor of the general provision rather than the exceptions.").

Further counseling against the Secretary's interpretation is the fact that reading "when coupled with" into the except clause would reduce the prohibition clause to mere surplusage. That is because the plain language of subsection (d)(1) provides that processes for removing voters based on change in residence *must* incorporate subsection (d)'s confirmation notice procedure. *See* 52 U.S.C. § 20507(d)(1). In other words, it is *required* that such processes be "coupled with" subsection (d)'s procedure. Thus, under the Secretary's interpretation, subsection (b)(2)'s prohibition clause would serve no purpose because all state procedures would necessarily be permitted by the except clause by virtue of their (mandatory) incorporation of the

confirmation notice procedure. This reading of the NVRA would contravene the Supreme Court's repeated insistence that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 134 S. Ct. 2242, 2248 (2014) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

The Secretary responds that his interpretation does not reduce the prohibition clause to surplusage because when read together, the prohibition and except clauses constitute a single "belt-and-suspenders" rule that merely "explains what is permitted and what is prohibited by describing both sides of the same coin." (Def.'s Br. at 49 (citing *TMW Enter., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 577 (6th Cir. 2010)).) In other words, the Secretary would have us hold that subsection (b)(2) only prohibits processes that do not incorporate the confirmation notice procedure, and that the except clause simply reinforces that prohibition by expressly "permitt[ing]" use of the confirmation notice and safe-harbor procedures. (*Id.*) But this argument once again ignores the fact that subsection (d)(1) already mandates that "[a] State *shall not* remove the name of a registrant from the official list of voters" without performing the confirmation notice procedure. 52 U.S.C. § 20507(d)(1) (emphasis added). We decline to read subsection (b)(2) as a mere reiteration of that mandate. Perhaps more importantly, we find that the Secretary's "belt-and-suspenders" argument ignores the NVRA's plain language: subsection (b)(2)'s clauses are not written as alternative presentations of the same rule; rather, those clauses explicitly establish a general rule with a proviso. *See id.* § 20507(b)(2).

The Secretary also argues that the Senate and House reports accompanying the NVRA justify his interpretation of the except clause. Those reports both state, in pertinent part:

> Almost all states now employ some procedure for updating lists at least once every two years, though practices may vary somewhat from county to county. About one-fifth of the states canvass all voters on the list. The rest of the states do not contact all voters, but instead target only those who did not vote in the most recent election (using not voting as an indication that an individual might have moved). Of these, only a handful of states simply drop the non-voters from the list without notice. These states could not continue this practice under [the NVRA].

S. Rep. No. 103-6, at 46 (1993); H.R. Rep. No. 103-9, at 30 (1993). This passage in the reports, the Secretary argues, suggests that subsection (b)(2)'s prohibition is intended to invalidate only

those state processes that "simply drop the non-voters from the list without notice." *Id.* Thus, the argument goes, the reports indicate that the except clause permits any process that incorporates subsection (d)'s confirmation notice procedure.

This argument is problematic for at least two reasons. First, we may only look to the legislative history of a statute to "explain the meaning and purpose of a provision whose text is genuinely ambiguous." *Sherfel v. Newson*, 768 F.3d 561, 569 (6th Cir. 2014). As discussed above, the unambiguous language of Section 8 requires rejecting the Secretary's interpretation, lest we be forced to simultaneously write new language into, and essentially excise language out of, the NVRA. But even if we did conclude that the NVRA's language is ambiguous, we would find little solace in the even more ambiguous language of the congressional reports on which the Secretary relies. *Cf. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[L]egislative history is itself often murky, ambiguous, and contradictory."). Not only is the above-quoted passage from the congressional reports internally unclear as to which of the practices described therein is prohibited under the NVRA, the passage does not purport to provide an exhaustive list of processes that subsection (b)(2) was designed to prohibit. *See* H.R. Rep. No. 103-9, at 30 (1993); S. Rep. No. 103-6, at 46 (1993).

Based on the above, we reject the Secretary's contention that the Supplemental Process' incorporation of subsection (d)'s confirmation notice procedure means that the entire Supplemental Process is automatically permitted under the except clause. That interpretation of the NVRA would require us to improperly ignore "the language and design of the statute as a whole." *Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp.*, 654 F.3d 654, 657 (6th Cir. 2011) (quoting *United States v. Parrett*, 530 F.3d 422, 429 (6th Cir. 2008)). We further conclude that the only reasonable reading of the NVRA is that any part of a state's roll maintenance process that does not mimic the expressly permitted procedures outlined in subsections (c) or (d)—in this case, the Supplemental Process' two-year "trigger" provision—is subject to subsection (b)(2)'s prohibition clause.

**B.      The Supplemental Process violates subsection (b)(2)'s prohibition clause**

Having concluded that we must focus our analysis on the Supplemental Process' two-year trigger provision, we turn to the second dispositive question in this case: whether that trigger provision "*result*[*s*]" in removal by reason of failure to vote.  52 U.S.C. § 20507(b)(2) (emphasis added).  We typically "proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (internal brackets and quotation marks omitted) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)).  "Webster's dictionary defines 'result' as 'to proceed or arise as a consequence, effect, or conclusion.'" *Pension Trust Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 952 (9th Cir. 2002).  In this case, the Supplemental Process' trigger provision explicitly uses a person's failure to engage in any "voter activity"—which includes voting—for two years as the "trigger" for sending a confirmation notice.  Under the ordinary meaning of "result," the Supplemental Process would violate the prohibition clause because removal of a voter "proceed[s] or arise[s] as a consequence" of his or her failure to vote. *Id.*

As noted by the Secretary and the district court, however, subsection (b)(2)'s prohibition clause appears to have been given a more narrow interpretation by the HAVA.  Passed in 2002, the HAVA created an "independent . . . requirement [that states] maintain an accurate list of eligible voters." *Colón-Marrero v. Vélez*, 813 F.3d 1, 13 (1st Cir. 2016).  In connection with that requirement, the HAVA requires states to implement

> [a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, consistent with the National Voter Registration Act of 1993 ([52 U.S.C. § 20501] et seq.), registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed *solely* by reason of a failure to vote.

52 U.S.C. § 21083(a)(4)(A) (emphasis added).  This section of the HAVA, the Secretary argues, restates the NVRA's prohibition and except clauses "in slightly different words" (Def.'s Br. at 32), and in so doing suggests that subsection (b)(2)'s prohibition on consideration of failure to

vote only operates to prohibit state processes that remove registrants from the rolls "solely" by reason of their failure to vote.

In the end, however, this language from the HAVA does not change our analysis because operation of the Supplemental Process' trigger is ultimately based "solely" on a person's failure to vote. This is so, notwithstanding the fact that the Supplemental Process includes voting as one of several types of "voter activity" in which a voter must fail to engage in order to trigger the sending of a confirmation notice. We must assume not only that Congress intended the prohibition clause to play some role in the NVRA's statutory scheme, *see Clark*, 134 S. Ct. at 2248, but also that Congress intended the prohibition to be more than a paper tiger. But the clause would have no teeth at all if states could circumvent it by simply including "voting" in a disjunctive list of activities in which a registrant must fail to engage in order to "trigger" the confirmation notice procedure. In more concrete terms, a state cannot avoid the conclusion that its process results in removal "solely by reason of a failure to vote," 52 U.S.C. § 21083(a)(4), by providing that the confirmation notice procedure is triggered by a registrant's failure either to vote *or* to climb Mt. Everest *or* to hit a hole-in-one.

For his part, the Secretary reiterates that the Supplemental Process incorporates subsection (d)'s requirement that the voter must fail to respond to a confirmation notice before that voter can be removed from the rolls. He thereafter argues that the Process' incorporation of that failure-to-respond requirement insures that voters are never removed "solely" for failure to vote. But this argument merely rehashes the one we rejected above—that a state's process for identifying and removing voters who have changed residence comports with subsection (b)(2)'s prohibition clause so long as it incorporates subsection (d)'s confirmation notice procedure. This interpretation of the NVRA would render the prohibition clause entirely superfluous because subsection (d)(1) already requires states to use the confirmation notice procedure. *See* 52 U.S.C. § 20507(d)(1). Once again, we decline "to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011).

Finally, we note that the parties' arguments and the district court's order raise two additional questions: (1) whether processes for identifying and removing from the rolls voters

who have changed residence *must* have provisions that "trigger" subsection (d)'s confirmation notice procedure; and (2) what the NVRA and the HAVA have to say, if anything, about the form such "triggers" can or cannot take. While these questions are undoubtedly important, we need not answer them in order to hold that Ohio's Supplemental Process is impermissible under the NVRA. Regardless of whether "trigger" provisions are required, and regardless of what forms such "triggers" can or cannot take, it is clear that the Supplemental Process *does* include a trigger, and that that trigger constitutes perhaps the plainest possible example of a process that "result[s] in" removal of a voter from the rolls by reason of his or her failure to vote. 52 U.S.C. § 20507(d)(2). We therefore hold that Ohio's Supplemental Process violates Section 8, subsection (b)(2) of the NVRA.

## II.　Plaintiffs' Challenge to Ohio's Confirmation Notice Form

Below, the district court held: (1) that Plaintiffs' challenges to Ohio's confirmation notice form were mooted by the Secretary's adoption of a new form that addressed all but one of Plaintiffs' concerns; and (2) that Plaintiffs' remaining challenge to the form—that it fails to provide out-of-state voters with information on how to remain registered—is not supported by Section 8's statutory language.[6] We address these holdings in turn.

### A.　Mootness

Claims become moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1978) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Generally, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *Id.* (quoting *United States v. W. T. Grant*

---

[6]On appeal, the Secretary reiterates these arguments, but adds that Plaintiffs no longer have standing to bring their remaining challenge to the notice form because they have not shown that either they or their members have moved out of state—i.e., that they have been injured by the form's failure to provide registration information to out-of-state movers. This standing argument, however, is merely a mootness argument presented in another form. *Cf. Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 525 ("[S]tanding concerns only whether a plaintiff has a viable claim that a defendant's unlawful conduct was occurring at the time the complaint was filed, . . . while mootness addresses whether that plaintiff continues to have an interest in the outcome of the litigation." (citation and internal quotation marks omitted)). The Secretary does not dispute that Plaintiffs had standing to challenge the confirmation notice form at the outset of this litigation. We therefore do not address the Secretary's standing argument further.

*Co.*, 345 U.S. 629, 632 (1953)). However, a narrow exception to that general rule exists in cases where a defendant claiming that its voluntary compliance moots a case successfully carries "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *see also Davis*, 440 U.S. at 631 (holding that voluntary cessation can render an issue moot if "there is no reasonable expectation . . . that the alleged violation will recur" (citation and internal quotation marks omitted)). We have stated that it is a "rare instance" in which this standard will be met. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473 (6th Cir. 2008).

The Secretary argues that because he is a governmental actor, we should defer to his assurances that his recent changes to the confirmation notice form are permanent. Although it is true that "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties," *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) (quoting *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988)), such solicitude does not carry much of an official's burden of demonstrating that "there is no reasonable expectation . . . that the alleged violation will recur," *Davis*, 440 U.S. at 631. Indeed, the Supreme Court has declined to defer to a governmental actor's voluntary cessation, even where that cessation occurred pursuant to legislative process. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("[T]he city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated."); *see also League of Women Voters of Ohio*, 548 F.3d at 474 ("It is hard to see how the voluntary passage of legislation or issuance of directives can moot claims such as these." (footnote omitted)).

Nevertheless, apparently relying on such solicitude, the district court held that Plaintiffs' claims were moot because "[t]here is no evidence to suggest that the Defendant does not plan to use this Revised Notice in 2016 or at any other point in the future." (R. 66, PageID 23024.) We note as an initial matter, however, that this holding gets it backwards: Plaintiffs were not required to produce evidence suggesting that the Secretary planned on reengaging in the allegedly illegal behavior after resolution of the case. *See Laidlaw*, 528 U.S. at 190. Rather, it

was—and remains—the Secretary's "formidable burden" of "showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* The Secretary has failed to meet that burden in this case.

To begin, the new confirmation notice form was issued pursuant to the Secretary's "directive," rather than any legislative process. Thus, this is not a case in which reversing the cessation would be particularly burdensome. *Cf. Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 982 (6th Cir. 2012) (holding that the relevant issue was mooted by the defendant municipality's ordinance that was "years in the making"). Indeed, it appears from the record that the confirmation notice form is revised on a relatively frequent basis—at least four times in the last nine years, not counting the most recent revision. And because the Ohio Secretary of State is an elected official, there remains a distinct possibility that a future Secretary will be less inclined to maintain the confirmation notice in its current form. Finally, we note that the circumstances of the Secretary's issuance of the new form do not inspire confidence in his assurances regarding the likelihood of recurrence—he issued that new form on the same day as the parties' final merits briefs were due before the district court, attaching the form as an exhibit to his brief and only then presenting his mootness argument. This fact makes the Secretary's voluntary cessation appear less genuine. *See id.* (noting that the defendant municipalities' voluntary cessation "appear[ed] genuine").

Given these facts, we conclude that the Secretary has not carried his burden of showing that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190. Plaintiffs' challenges to the confirmation notice therefore have not been rendered moot by the new form. Even if we felt differently about the possibility of recurrence, however, that alone would not render Plaintiffs' request for an injunction moot. A claim becomes moot only if "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631; *see also Ragsdale*, 841 F.2d at 1365 (noting that an issue is moot only if "there are no remaining effects of the alleged violation"). As Plaintiffs note, the Secretary's newly-issued form does nothing to correct the fact that Ohio has, for years, been removing voters from the rolls because they failed to respond to forms that are blatantly non-compliant with the NVRA. Thus, in any event, the new

form could not render all of Plaintiffs' claims for relief moot. *Cf. Anderson v. Spear*, 356 F.3d 651, 655 (6th Cir. 2004) ("As is readily apparent, the action of the legislature suspending the operation of certain provisions of the campaign law [in 2003] does not eliminate the case or controversy which existed by the operation of those laws in 1999.").

###### B.    Merits

The final question before us concerns the merits of Plaintiffs' remaining challenge to the newly issued confirmation notice form.  Plaintiffs argue that the form does not comply with the NVRA's mandate, contained in subsection (d)(2)(B) of Section 8, that "[i]f the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered," any confirmation notice sent to that voter must provide "information concerning how the registrant can continue to be eligible to vote."  52 U.S.C. § 20507(d)(2)(B).  Plaintiffs assert that the newly issued form violates this provision because it does not provide Ohio registrants who have moved out of state with information on how to re-register in their new state.[7]  This requirement could be satisfied, Plaintiffs contend, by simply modifying the confirmation notice to direct the recipient to the Federal Election Assistance Commission's website, on which the recipient will find "instructions and guidance for voter registration in all states."  (Pls.' Br. at 44 n.15.)

Below, the district court held that it "defies logic that the NVRA would saddle the various secretaries of state (or their equivalents) with the onerous burden of coaching out-of-state residents through the registration process in their new states of residence."  (R. 66, PageID 23025.)  In support of this assertion, the court noted that the subsection on which Plaintiffs' argument is based provides that states must supply registrants with information on how to "*continue*" to be eligible to vote.  (*Id.* (quoting 52 U.S.C. § 20507(d)(2)(B)).)  Without much additional analysis, the district court proclaimed that the word "continue" necessarily means "continue to vote within that State—not register in another state."  (*Id.*)  The Secretary's

---

[7]Below, the district court concluded that this argument was waived because "Plaintiffs . . . raised this argument for the first time in their Reply brief."  (R. 66, PageID 23024.)  This was error; Plaintiffs' motion for summary judgment explicitly argued that Ohio's confirmation notice forms "do[] not tell people who have moved out of the state how they can register in their new state."  (R. 39, Pls.' Mot. for Summ. J., PageID 1407 (citing 52 U.S.C. § 20507(d)(2)(B)).)

arguments on appeal buttress this conclusion by arguing that "[n]o voter can 'continue to be eligible' to vote by moving from Ohio to Michigan, . . . [r]ather, the new Michigander must become a *newly registered* Michigan voter." (Def.'s Br. at 54.)

We find this argument unavailing. To begin, subsection (d)(2)(B)'s plain language contains no intra-state limitation. *See* 52 U.S.C. § 20507(d)(2)(B). Instead, that subsection provides that information on how to continue to be eligible to vote must be presented to anyone who "has changed residence to a place outside the registrar's jurisdiction." *Id.* The "outside the registrar's jurisdiction" language is the part of subsection (b)(2)(B)'s mandate that establishes its geographic applicability—had Congress intended to place geographic limitations on the mandate, it would have done so with this language rather than relying on a counterintuitive definition of the word "continue." Moreover, that word—"continue"—must be accorded its ordinary meaning. *Cloer*, 133 S. Ct. at 1893 ("[U]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning."). "Continue" means to "keep up or maintain esp[ecially] without interruption a particular condition." Webster's Third New International Dictionary 493 (1986). Certainly, a registrant can "keep up or maintain . . . without interruption," *id.*, her condition of being "eligible to vote," 52 U.S.C. § 20507(d)(2)(B), regardless of whether she must fully re-register or merely confirm her new address.

Further weighing against the Secretary's interpretation of subsection (d)(2)(B)—whereby "continuing" to vote excludes situations in which voters must fully re-register—is the fact that some states require voters to fully re-register even when they move to a new jurisdiction within the same state. *See, e.g.*, N.J. Stat. § 19:31-11 ("A voter who moves from an election district in one county to an election district in another county prior to the close of registration preceding an election shall register in the new county of residence . . . ."); Okla. Stat. tit. 26, § 4-118 ("Any registered voter who changes his or her residence to another county may apply for registration as an initial registrant in such other county."). Indeed, the 2007 version of Ohio's confirmation notice form suggests that Ohio itself once required voters who moved between counties to fully re-register. Under the Secretary's reasoning, intra-state movers subject to such re-registration requirements would not be entitled to "information concerning how [they] can continue to be eligible to vote," 52 U.S.C. § 20507(d)(2)(B), because the requirement that they re-register

means that they are not "continuing" to be eligible to vote.  Not only would this outcome completely defeat the purpose of subsection (d)(2)(B)'s mandate in states with re-registration requirements, it would contradict the Secretary and district court's own conclusion that the word "continue" operates to free states of subsection (b)(2)(B)'s mandate with regard to out-of-state movers only.

In sum, we conclude that the district court erred by holding that Plaintiffs' claims regarding Ohio's confirmation notice are moot, and that the court erred by concluding that Ohio need not provide out-of-state movers with information on how they can continue to be eligible to vote.

## CONCLUSION

For the reasons stated above, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

SILER, Circuit Judge, dissenting in part and concurring in part. Because of the urgency of this issue and the need to allow the Supreme Court to consider it, I write the dissent/concurrence in condensed fashion. It does not reflect the extent to which I disagree with the majority opinion, although I respect it.

I commend the Secretary for issuing a new confirmation notice form during the pendency of this litigation. In all aspects of the law, except for directions on how the voter can continue his registration, it complies with the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA).

Both sides agree that the language of the NVRA is unambiguous. "If the words of the statute are unambiguous, the judicial inquiry is at an end, and the plain meaning of the text must be enforced." *United States v. Plavcak*, 411 F.3d 655, 661 (6th Cir. 2005) (quoting *Hudson v. Reno*, 130 F.3d 1193, 1196 (6th Cir. 1997)).

This seems to be a much simpler process than as outlined in the majority opinion. The Secretary has established a Supplemental Process for purging voters from the voting rolls in Ohio. The key language in the statute attacked by the plaintiffs is from 52 U.S.C. § 20507(b)(2), which directs that States shall not remove "the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote." However, that same subsection allows a State to use "the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters" under certain circumstances. *Id.* That subsection indicates that if the voter

(A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

(B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office,

then subsection (d) provides how States may cancel registrations of those who may have changed addresses. *Id.* It provides that the registrant should not be removed from the list of voters unless he or she confirms that he or she has changed residence or has failed to respond to a notice described in paragraph (2) and has not voted during a certain period of time. 52 U.S.C. § 20507(d)(1).

The part of the statute which is in contention is § 20507(b)(2), which indicates that the State shall not remove the voter "by reason of the person's failure to vote." The Secretary indicates that the person is not removed from the voting rolls until after the registrant is sent a notice by mail to find out if he or she still lives at the old address. Not until that person fails to respond, as plaintiff Larry Harmon did, does the State then list the voter as "inactive" in the registration database. Nevertheless, this "inactive" voter has all the rights to cast a regular ballot at any election, but if four years transpire without the registrant's voting, his or her registration record is canceled. However, if the registrant has any voting activity during those four years, he or she returns to an active voter status.

The text of the NVRA directs the States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or relocation. 52 U.S.C. § 20507(a)(4). The district court found the Secretary has made a reasonable effort to carry out that mandate, and I agree. The State cannot remove the registrant's name from the rolls for a failure to vote only, and Ohio does not do so. It removes registrants only if (1) they have not voted or updated their registration for the last two years, (2) also failed to respond to the address-confirmation notice, and (3) then failed to engage in any voter activity in four consecutive years, including two consecutive Federal elections following that notice.

The decision of the district court also follows the language in HAVA. The district court cited the following language from that act:

> [C]onsistent with the National Voter Registration Act of 1993 . . . , registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote.

52 U.S.C. § 21083(a)(4).   As the Secretary has explained, it is his position that no voter is removed solely by reason of a failure to vote, and thus he has complied with the language from both statutes.  I agree.  The statutes leave it to the States to implement, and Ohio has developed a lawful procedure.

On the question of mootness, I agree with the majority that the plaintiffs had standing to bring the challenge to the notice form when the case was filed.  However, I disagree with the conclusion that this case is not moot because the issues, save one, concerning the confirmation notice form have been corrected by the Secretary.  Cessation of certain "conduct by government officials has been treated with more solicitude by the courts than similar action by private parties." *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) (quoting *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988)).  I agree with the district court that there is no evidence to show that the Secretary would change the current notice, and this court should give him deference on that question.  However, I concur with the majority that the current notice does not comply with the NVRA final mandate that when the Secretary sends the confirmation notice that the registrant has been purged, the notice must provide "information concerning how the registrant can continue to be eligible to vote."  52 U.S.C. § 20507(d)(2)(B).

The district court found that this issue was waived by the plaintiffs for failure to include it in their pleadings before filing their reply brief.  However, their motion for summary judgment argued that the confirmation notice forms do not advise people who have moved out of the State how they could register in their new State.  Although I agree with the district court that the State officials have been given an "onerous burden of coaching out-of-state residents through the registration process in their new States of residence," that is what the statute requires. The district court ruled that the mandate only applies to give the registrant information about registering in another location in Ohio, but the language of the statute is broader than that.  In their brief on appeal, plaintiffs have suggested that an easy way to comply would be by directing voters to the Election Assistance Commission's website containing the federal form, which provides instructions and guidance for voter registration in all States.  Although such a notice should be easy to attach to the notification to the registrants, it assumes that all registrants know

how to utilize websites. Nevertheless, that is the relief which the plaintiffs have requested, and it seems simple enough for the Secretary to institute that amendment to the notice.

Therefore, I would affirm the decision of the district court, except insofar as it declined to require the Secretary to amend its notice to voters who have moved to other States. I would grant relief on that sole issue.