(Slip Opinion) OCTOBER TERM, 2017 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HUSTED, OHIO SECRETARY OF STATE *v.* A. PHILIP RANDOLPH INSTITUTE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 16–980. Argued January 10, 2018—Decided June 11, 2018

The National Voter Registration Act (NVRA) addresses the removal of ineligible voters from state voting rolls, 52 U. S. C. §20501(b), including those who are ineligible "by reason of" a change in residence, §20507(a)(4). The Act prescribes requirements that a State must meet in order to remove a name on change-of-residence grounds, §§20507(b), (c), (d). The most relevant of these are found in subsection (d), which provides that a State may not remove a name on change-of-residence grounds unless the registrant either (A) confirms in writing that he or she has moved or (B) fails to return a preaddressed, postage prepaid "return card" containing statutorily prescribed content and then fails to vote in any election during the period covering the next two general federal elections.

In addition to these specific change-of-residence requirements, the NVRA also contains a general "Failure-to-Vote Clause," §20507(b)(2), consisting of two parts. It first provides that a state removal program "shall not result in the removal of the name of any person . . . by reason of the person's failure to vote." Second, as added by the Help America Vote Act of 2002 (HAVA), it specifies that "nothing in [this prohibition] may be construed to prohibit a State from using the procedures" described above—sending a return card and removing registrants who fail to return the card and fail to vote for the requisite time. Since one of the requirements for removal under subsection (d) is the failure to vote, the explanation added by HAVA makes clear that the Failure-to-Vote Clause's prohibition on removal "by reason of the person's failure to vote" does not categorically preclude using nonvoting as part of a test for removal. Another provision makes this point even more clearly by providing that "no registrant

may be removed *solely* by reason of a failure to vote." §21083(a)(4)(A) (emphasis added).

Respondents contend that Ohio's process for removing voters on change-of-residence grounds violates this federal law. The Ohio process at issue relies on the failure to vote for two years as a rough way of identifying voters who may have moved. It sends these nonvoters a preaddressed, postage prepaid return card, asking them to verify that they still reside at the same address. Voters who do not return the card *and* fail to vote in any election for four more years are presumed to have moved and are removed from the rolls.

*Held*: The process that Ohio uses to remove voters on change-of-residence grounds does not violate the Failure-to-Vote Clause or any other part of the NVRA. Pp. 8–21.

(a) Ohio's law does not violate the Failure-to-Vote Clause. Pp. 8–16.

(1) Ohio's removal process follows subsection (d) to the letter: It does not remove a registrant on change-of-residence grounds unless the registrant is sent and fails to mail back a return card and then fails to vote for an additional four years. See §20507(d)(1)(B). Pp. 8–9.

(2) Nonetheless, respondents argue that Ohio's process violates subsection (b)'s Failure-to-Vote Clause by using a person's failure to vote twice over: once as the trigger for sending return cards and again as one of the two requirements for removal. But Congress could not have meant for the Failure-to-Vote Clause to cannibalize subsection (d) in that way. Instead, the Failure-to-Vote Clause, both as originally enacted in the NVRA and as amended by HAVA, simply forbids the use of nonvoting as *the sole criterion* for removing a registrant, and Ohio does not use it that way. The phrase "by reason of" in the Failure-to-Vote Clause denotes some form of causation, see *Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167, 176, and in context sole causation is the only type of causation that harmonizes the Failure-to-Vote Clause and subsection (d). Any other reading would mean that a State that follows subsection (d) nevertheless can violate the Failure-to-Vote Clause. When Congress enacted HAVA, it made this point explicit by adding to the Failure-to-Vote Clause an explanation of how the clause is to be read, *i.e.*, in a way that does not contradict subsection (d). Pp. 9–12.

(3) Respondents' and the dissent's alternative reading is inconsistent with both the text of the Failure-to-Vote Clause and the clarification of its meaning in §21083(a)(4). Among other things, their reading would make HAVA's new language worse than redundant, since no sensible person would read the Failure-to-Vote Clause as prohibiting what subsections (c) and (d) expressly allow. Nor does

the Court's interpretation render the Failure-to-Vote Clause super-
fluous; the clause retains meaning because it prohibits States from
using nonvoting both as the ground for removal and as the sole evi-
dence for another ground for removal (*e.g.*, as the sole evidence that
someone has died). Pp. 12–15.

　　(4) Respondents' additional argument—that so many registered
voters discard return cards upon receipt that the failure to send cards
back is worthless as evidence that an addressee has moved—is based
on a dubious empirical conclusion that conflicts with the congression-
al judgment found in subsection (d). Congress clearly did not think
that the failure to send back a return card was of no evidentiary val-
ue, having made that conduct one of the two requirements for remov-
al under subsection (d). Pp. 15–16.

　(b) Nor has Ohio violated other NVRA provisions. Pp. 16–21.

　　(1) Ohio removes the registrants at issue on a permissible
ground: change of residence. The failure to return a notice and the
failure to vote simply serve as *evidence* that a registrant has moved,
not as the ground itself for removal. Pp. 16–17.

　　(2) The NVRA contains no "reliable indicator" prerequisite to
sending notices, requiring States to have good information that
someone has moved before sending them a return card. So long as
the trigger for sending such notices is "uniform, nondiscriminatory,
and in compliance with the Voting Rights Act," §20507(b)(1), States
may use whatever trigger they think best, including the failure to
vote. Pp. 17–19.

　　(3) Ohio has not violated the NVRA's "reasonable effort" provi-
sion, §20507(a)(4). Even assuming that this provision authorizes fed-
eral courts to go beyond the restrictions set out in subsections (b), (c),
and (d) and strike down a state law that does not meet some stand-
ard of "reasonableness," Ohio's process cannot be unreasonable be-
cause it uses the change-of-residence evidence that Congress said it
could: the failure to send back a notice coupled with the failure to
vote for the requisite period. Ohio's process is accordingly lawful.
Pp. 19–21.

838 F. 3d 699, reversed.

　ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J.,
and KENNEDY, THOMAS, and GORSUCH, JJ., joined. THOMAS, J., filed a
concurring opinion. BREYER, J., filed a dissenting opinion, in which
GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. SOTOMAYOR, J., filed a
dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES
_____

No. 16–980
_____

## JON HUSTED, OHIO SECRETARY OF STATE, PETITIONER *v.* A. PHILIP RANDOLPH INSTITUTE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 11, 2018]

JUSTICE ALITO delivered the opinion of the Court.

It has been estimated that 24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate.  Pew Center on the States, Election Initiatives Issue Brief (Feb. 2012).  And about 2.75 million people are said to be registered to vote in more than one State.  *Ibid.*

At issue in today's case is an Ohio law that aims to keep the State's voting lists up to date by removing the names of those who have moved out of the district where they are registered.  Ohio uses the failure to vote for two years as a rough way of identifying voters who may have moved, and it then sends a preaddressed, postage prepaid card to these individuals asking them to verify that they still reside at the same address.  Voters who do not return this card *and* fail to vote in any election for four more years are presumed to have moved and are removed from the rolls. We are asked to decide whether this program complies with federal law.

# I
## A

Like other States, Ohio requires voters to reside in the district in which they vote. Ohio Rev. Code Ann. §3503.01(A) (West Supp. 2017); see National Conference of State Legislatures, Voting by Nonresidents and Non-citizens (Feb. 27, 2015). When voters move out of that district, they become ineligible to vote there. See §3503.01(A). And since more than 10% of Americans move every year,[1] deleting the names of those who have moved away is no small undertaking.

For many years, Congress left it up to the States to maintain accurate lists of those eligible to vote in federal elections, but in 1993, with the enactment of the National Voter Registration Act (NVRA), Congress intervened. The NVRA "erect[s] a complex superstructure of federal regulation atop state voter-registration systems." *Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U. S. 1, 5 (2013). The Act has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls. See §2, 107 Stat. 77, 52 U. S. C. §20501(b).

To achieve the latter goal, the NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names" of voters who are ineligible "by reason of" death or change in residence. §20507(a)(4).

---

[1] United States Census Bureau, CB16–189, Americans Moving at Historically Low Rates (Nov. 16, 2016), available at https://www.census.gov/newsroom/press-releases/2016/cb16-189.html (all Internet materials as last visited June 8, 2018). States must update the addresses of even those voters who move within their county of residence, for (among other reasons) counties may contain multiple voting districts. Cf. *post*, at 12 (BREYER, J., dissenting). For example, Cuyahoga County contains 11 State House districts. See House District Map, Ohio House Districts 2012–2022, online at http://www.ohiohouse.gov/members/district-map.

The Act also prescribes requirements that a State must meet in order to remove a name on change-of-residence grounds. §§20507(b), (c), (d).

The most important of these requirements is a prior notice obligation. Before the NVRA, some States removed registrants without giving any notice. See J. Harris, Nat. Munic. League, Model Voter Registration System 45 (rev. 4th ed. 1957). The NVRA changed that by providing in §20507(d)(1) that a State may not remove a registrant's name on change-of-residence grounds unless either (A) the registrant confirms in writing that he or she has moved or (B) the registrant fails to return a preaddressed, postage prepaid "return card" containing statutorily prescribed content. This card must explain what a registrant who has not moved needs to do in order to stay on the rolls, *i.e.*, either return the card or vote during the period covering the next two general federal elections. §20507(d)(2)(A). And for the benefit of those who have moved, the card must contain "information concerning how the registrant can continue to be eligible to vote." §20507(d)(2)(B). If the State does not send such a card or otherwise get written notice that the person has moved, it may not remove the registrant on change-of-residence grounds. See §20507(d)(1).[2]

While the NVRA is clear about the need to send a "return card" (or obtain written confirmation of a move) before pruning a registrant's name, no provision of federal law specifies the circumstances under which a return card

_____

[2] The principal dissent attaches a misleading label to this return card, calling it a "'last chance' notice." *Post*, at 6–7, 9–12 (opinion of BREYER, J.). It is actually no such thing. Sending back the notice does not represent a voter's "last chance" to avoid having his or her name stricken from the rolls. Instead, such a voter has many more chances over a period of four years to avoid that result. All that the voter must do is vote in any election during that time. See 52 U. S. C. §20507(d)(1)(B).

may be sent. Accordingly, States take a variety of approaches. See Nat. Assn. of Secretaries of State (NASS) Report: Maintenance of State Voter Registration Lists 5–6 (Dec. 2017). The NVRA itself sets out one option. A State may send these cards to those who have submitted "change-of-address information" to the United States Postal Service. §20507(c)(1). Thirty-six States do at least that. See NASS Report, *supra*, at 5, and n. v (listing States). Other States send notices to every registered voter at specified intervals (say, once a year). See, *e.g.*, Iowa Code §48A.28.3 (2012); S. C. Code Ann. §§7–5–330(F), 7–5–340(2)–(3) (2017 Cum. Supp.); see also S. Rep. No. 103–6, p. 46 (1993). Still other States, including Ohio, take an intermediate approach, see NASS Report, *supra*, at 5–6, such as sending notices to those who have turned in their driver's licenses, *e.g.*, Ind. Code §§3–7–38.2–2(b)(2), (c)(4) (2004), or sending notices to those who have not voted for some period of time, see, *e.g.*, Ga. Code Ann. §21–2–234 (Supp. 2017); Ohio Rev. Code Ann. §3503.21(B)(2); Okla. Admin. Code §230:15–11–19(a)(3) (2016); Pa. Stat. Ann., Tit. 25, §1901(b)(3) (Purdon 2007); Wis. Stat. Ann. §6.50(1) (2017 West Cum. Supp.).

When a State receives a return card confirming that a registrant has left the district, the State must remove the voter's name from the rolls. §§20507(d)(1)(A), (3). And if the State receives a card stating that the registrant has not moved, the registrant's name must be kept on the list. See §20507(d)(2)(A).

What if no return card is mailed back? Congress obviously anticipated that some voters who received cards would fail to return them for any number of reasons, and it addressed this contingency in §20507(d), which, for convenience, we will simply call "subsection (d)." Subsection (d) treats the failure to return a card as *some evidence*—but by no means conclusive proof—that the voter has moved. Instead, the voter's name is kept on the list

for a period covering two general elections for federal office (usually about four years). Only if the registrant fails to vote during that period and does not otherwise confirm that he or she still lives in the district (*e.g.*, by updating address information online) may the registrant's name be removed. §20507(d)(2)(A); see §§20507(d)(1)(B), (3).

In addition to these specific change-of-residence requirements, the NVRA also imposes two general limitations that are applicable to state removal programs. First, all such programs must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." §20507(b)(1). Second, the NVRA contains what we will call the "Failure-to-Vote Clause." See §20507(b)(2).

At present, this clause contains two parts. The first is a prohibition that was included in the NVRA when it was originally enacted in 1993. It provides that a state program "shall not result in the removal of the name of any person . . . by reason of the person's failure to vote." *Ibid.* The second part, added by the Help America Vote Act of 2002 (HAVA), 116 Stat. 1666, explains the meaning of that prohibition. This explanation says that "nothing in [the prohibition] may be construed to prohibit a State from using the procedures described in [§§20507](c) and (d) to remove an individual from the official list of eligible voters." §20507(b)(2).

These referenced subsections, §§20507(c) and (d), are the provisions allowing the removal of registrants who either submitted change-of-address information to the Postal Service (subsection (c)) or did not mail back a return card and did not vote during a period covering two general federal elections (subsection (d)). And since one of the requirements for removal under subsection (d) is the failure to vote during this period, the explanation added by HAVA in 2002 makes it clear that the statutory phrase "by reason of the person's failure to vote" in the Failure-to-Vote Clause does not categorically preclude the use of

nonvoting as part of a test for removal.

Another provision of HAVA makes this point more directly. After directing that "registrants who have not responded to a notice and . . . have not voted in 2 consecutive general elections for Federal office shall be removed," it adds that "no registrant may be removed *solely* by reason of a failure to vote." §21083(a)(4)(A) (emphasis added).

### B

Since 1994, Ohio has used two procedures to identify and remove voters who have lost their residency qualification.

First, the State utilizes the Postal Service option set out in the NVRA. The State sends notices to registrants whom the Postal Service's "national change of address service" identifies as having moved. Ohio Rev. Code Ann. §3503.21(B)(1). This procedure is undisputedly lawful. See 52 U. S. C. §20507(c)(1).

But because according to the Postal Service "[a]s many as 40 percent of people who move do not inform the Postal Service,"[3] Ohio does not rely on this information alone. In its so-called Supplemental Process, Ohio "identif[ies] electors whose lack of voter activity indicates they may have moved." Record 401 (emphasis deleted). Under this process, Ohio sends notices to registrants who have "not engage[d] in any voter activity for a period of two consecutive years." *Id.*, at 1509. "Voter activity" includes "casting a ballot" in any election—whether general, primary, or special and whether federal, state, or local. See *id.*, at 1507. (And Ohio regularly holds elections on both even and odd years.) Moreover, the term "voter activity" is

--------

[3] U. S. Postal Service, Office of Inspector Gen., MS–MA–15–006, Strategies for Reducing Undeliverable as Addressed Mail 15 (2015); see also Brief for Buckeye Institute as *Amicus Curiae* 10. Respondents and one of their *amici* dispute this statistic. See Tr. of Oral Arg. 46; Brief for Asian Americans Advancing Justice et al. as *Amici Curiae* 27–28.

broader than simply voting. It also includes such things as "sign[ing] a petition," "filing a voter registration form, and updating a voting address with a variety of [state] entities." *Id.*, at 295, 357.

After sending these notices, Ohio removes registrants from the rolls only if they "fai[l] to respond" and "continu[e] to be inactive for an additional period of four consecutive years, including two federal general elections." *Id.*, at 1509; see Ohio Rev. Code Ann. §3503.21(B)(2). Federal law specifies that a registration may be canceled if the registrant does not vote "in an election during the period" covering two general federal elections after notice, §20507(d)(1)(B)(ii), but Ohio rounds up to "four consecutive years" of nonvoting after notice, Record 1509. Thus, a person remains on the rolls if he or she votes in any election during that period—which in Ohio typically means voting in any of the at least four elections after notice. Combined with the two years of nonvoting before notice is sent, that makes a total of six years of nonvoting before removal. *Ibid.*

C

A pair of advocacy groups and an Ohio resident (respondents here) think that Ohio's Supplemental Process violates the NVRA and HAVA. They sued petitioner, Ohio's Secretary of State, seeking to enjoin this process. Respondents alleged, first, that Ohio removes voters who have not actually moved, thus purging the rolls of *eligible* voters. They also contended that Ohio violates the NVRA's Failure-to-Vote Clause because the failure to vote plays a prominent part in the Ohio removal scheme: Failure to vote for two years triggers the sending of a return card, and if the card is not returned, failure to vote for four more years results in removal.

The District Court rejected both of these arguments and entered judgment for the Secretary. It held that Ohio's

Supplemental Process "mirror[s] the procedures established by the NVRA" for removing people on change-of-residence grounds and does not violate the Failure-to-Vote Clause because it does not remove anyone "*solely* for [their] failure to vote." App. to Pet. for Cert. 43a, 57a, 69a–70a.

A divided panel of the Court of Appeals for the Sixth Circuit reversed. 838 F. 3d 699 (2016). It focused on respondents' second argument, holding that Ohio violates the Failure-to-Vote Clause because it sends change-of-residence notices "based 'solely' on a person's failure to vote." *Id.*, at 711. In dissent, Judge Siler explained why he saw the case as a simple one: "The State cannot remove the registrant's name from the rolls for a failure to vote only, and Ohio does not do [that]." *Id.*, at 716.

We granted certiorari, 581 U. S. ___ (2017), and now reverse.

II
A

As noted, subsection (d), the provision of the NVRA that directly addresses the procedures that a State must follow before removing a registrant from the rolls on change-of-residence grounds, provides that a State may remove a registrant who "(i) has failed to respond to a notice" and "(ii) has not voted or appeared to vote . . . during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice" (about four years). 52 U. S. C. §20507(d)(1)(B). Not only are States allowed to remove registrants who satisfy these requirements, but federal law makes this removal mandatory. §20507(d)(3); see also §21083(a)(4)(A).

Ohio's Supplemental Process follows subsection (d) to the letter. It is undisputed that Ohio does not remove a registrant on change-of-residence grounds unless the

registrant is sent and fails to mail back a return card and then fails to vote for an additional four years.

## B

Respondents argue (and the Sixth Circuit held) that, even if Ohio's process complies with subsection (d), it nevertheless violates the Failure-to-Vote Clause—the clause that generally prohibits States from removing people from the rolls "by reason of [a] person's failure to vote." §20507(b)(2); see also §21083(a)(4)(A). Respondents point out that Ohio's Supplemental Process uses a person's failure to vote twice: once as the trigger for sending return cards and again as one of the requirements for removal. Respondents conclude that this use of nonvoting is illegal.

We reject this argument because the Failure-to-Vote Clause, both as originally enacted in the NVRA and as amended by HAVA, simply forbids the use of nonvoting as *the sole criterion* for removing a registrant, and Ohio does not use it that way. Instead, as permitted by subsection (d), Ohio removes registrants only if they have failed to vote *and* have failed to respond to a notice.

When Congress clarified the meaning of the NVRA's Failure-to-Vote Clause in HAVA, here is what it said: "[C]onsistent with the [NVRA], . . . no registrant may be removed *solely* by reason of a failure to vote." §21083(a)(4)(A) (emphasis added). The meaning of these words is straightforward. "Solely" means "alone." Webster's Third New International Dictionary 2168 (2002); American Heritage Dictionary 1654 (4th ed. 2000). And "by reason of" is a "quite formal" way of saying "[b]ecause of." C. Ammer, American Heritage Dictionary of Idioms 67 (2d ed. 2013). Thus, a State violates the Failure-to-Vote Clause only if it removes registrants for no reason other than their failure to vote.

This explanation of the meaning of the Failure-to-Vote Clause merely makes explicit what was implicit in the

clause as originally enacted.  At that time, the clause simply said that a state program "shall not result in the removal of the name of any person from the [rolls for federal elections] by reason of the person's failure to vote." 107 Stat. 83.  But that prohibition had to be read together with subsection (d), which authorized removal if a registrant did not send back a return card and also failed to vote during a period covering two successive general elections for federal office.  If possible, "[w]e must interpret the statute to give effect to both provisions," *Ricci* v. *DeStefano*, 557 U. S. 557, 580 (2009), and here, that is quite easy.

The phrase "by reason of" denotes some form of causation.  See *Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167, 176 (2009).  Thus, the Failure-to-Vote Clause applies when nonvoting, in some sense, causes a registrant's name to be removed, but the law recognizes several types of causation.  When a statutory provision includes an undefined causation requirement, we look to context to decide whether the statute demands only but-for cause as opposed to proximate cause or sole cause.  See *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 265–268 (1992).  Cf. *CSX Transp., Inc.* v. *McBride*, 564 U. S. 685, 692–693 (2011).

Which form of causation is required by the Failure-to-Vote Clause? We can readily rule out but-for causation.  If "by reason of" in the Failure-to-Vote Clause meant but-for causation, a State would violate the clause if the failure to vote played a necessary part in the removal of a name from the list.  *Burrage* v. *United States*, 571 U. S. 204, 211 (2014).  But the removal process expressly authorized by subsection (d) allows a State to remove a registrant if the registrant, in addition to failing to send back a return card, fails to vote during a period covering two general federal elections.  So if the Failure-to-Vote Clause were read in this way, it would cannibalize subsection (d).

Interpreting the Failure-to-Vote Clause as incorporating a proximate cause requirement would lead to a similar problem. Proximate cause is an elusive concept, see *McBride*, *supra*, at 692–693, but no matter how the term is understood, it is hard to escape the conclusion that the failure to vote is a proximate cause of removal under subsection (d). If a registrant, having failed to send back a return card, also fails to vote during the period covering the next two general federal elections, removal is the direct, foreseeable, and closely connected consequence. See *Paroline* v. *United States*, 572 U. S. 434, 444–445 (2014); *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U. S. 639, 654 (2008).

By process of elimination, we are left with sole causation. This reading harmonizes the Failure-to-Vote Clause and subsection (d) because the latter provision does not authorize removal solely by reason of a person's failure to vote. Instead, subsection (d) authorizes removal only if a registrant also fails to mail back a return card.

For these reasons, we conclude that the Failure-to-Vote Clause, as originally enacted, referred to sole causation. And when Congress enacted HAVA, it made this point explicit. It added to the Failure-to-Vote Clause itself an explanation of how it is to be read, *i.e.*, in a way that does not contradict subsection (d). And in language that cannot be misunderstood, it reiterated what the clause means: "[R]egistrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed *solely* by reason of a failure to vote." §21083(a)(4)(A) (emphasis added). In this way, HAVA dispelled any doubt that a state removal program may use the failure to vote as a factor (but not the sole factor) in removing names from the list of registered voters.

That is exactly what Ohio's Supplemental Process does.

It does not strike any registrant solely by reason of the failure to vote.  Instead, as expressly permitted by federal law, it removes registrants only when they have failed to vote *and* have failed to respond to a change-of-residence notice.

C

Respondents and the dissent advance an alternative interpretation of the Failure-to-Vote Clause, but that reading is inconsistent with both the text of the clause and the clarification of its meaning in §21083(a)(4)(A).  Respondents argue that the clause allows States to consider nonvoting only to the extent that subsection (d) requires— that is, only *after* a registrant has failed to mail back a notice.  Any other use of the failure to vote, including as the trigger for mailing a notice, they claim, is proscribed. In essence, respondents read the language added to the clause by HAVA—"except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d)"—as an exception to the general rule forbidding the use of nonvoting. See Brief for Respondents 37.  And the Sixth Circuit seemed to find this point dispositive, reasoning that "'exceptions in statutes must be strictly construed.'"  838 F. 3d, at 708 (quoting *Detroit Edison Co.* v. *SEC*, 119 F. 2d 730, 739 (CA6 1941)).

We reject this argument for three reasons.  First, it distorts what the new language added by HAVA actually says.  The new language does not create an exception to a general rule against the use of nonvoting.  It does not say that the failure to vote may not be used "except that this paragraph does not prohibit a State from using the procedures described in subsections (c) and (d)."  Instead, it says that "nothing in this paragraph *may be construed*" to have that effect.  §20507(b)(2) (emphasis added).  Thus, it sets out not an exception, but a rule of interpretation.  It

does not narrow the language that precedes it; it clarifies what that language means. That is precisely what Congress said when it enacted HAVA: It added the "may not be construed" provision to "[c]larif[y]," not to alter, the prohibition's scope. §903, 116 Stat. 1728.

Second, under respondents' reading, HAVA's new language is worse than superfluous. Even without the added language, no sensible person would read the Failure-to-Vote Clause as prohibiting what subsections (c) and (d) expressly allow. Yet according to respondents, that is all that the new language accomplishes. So at a minimum, it would be redundant.

But the implications of this reading are actually worse than that. There is no reason to create an exception to a prohibition unless the prohibition would otherwise forbid what the exception allows. So if the new language were an exception, it would seem to follow that prior to HAVA, the Failure-to-Vote Clause *did* outlaw what subsections (c) and (d) specifically authorize. And that, of course, would be nonsensical.

Third, respondents' reading of the language that HAVA added to the Failure-to-Vote Clause makes it hard to understand why Congress prescribed in another section of the same Act, *i.e.*, §21083(a)(4)(A), that "no registrant may be removed solely by reason of a failure to vote." As interpreted by respondents, the amended Failure-to-Vote Clause prohibits any use of nonvoting with just two narrow exceptions—the uses allowed by subsections (c) and (d). So, according to respondents, the amended Failure-to-Vote Clause prohibits much more than §21083(a)(4)(A). That provision, in addition to allowing the use of nonvoting in accordance with subsections (c) and (d), also permits the use of nonvoting in any other way that does not treat nonvoting as the sole basis for removal.

There is no plausible reason why Congress would enact the provision that respondents envision. As interpreted by

respondents, HAVA would be like a law that contains one provision making it illegal to drive with a blood alcohol level of 0.08 or higher and another provision making it illegal to drive with a blood alcohol level of 0.10 or higher. The second provision would not only be redundant; it would be confusing and downright silly.

Our reading, on the other hand, gives the new language added to the Failure-to-Vote Clause "real and substantial effect." *Husky Int'l Electronics, Inc.* v. *Ritz*, 578 U. S. ___, ___ (2016) (slip op., at 4) (internal quotation marks omitted). It clarifies the meaning of the prohibition against removal by reason of nonvoting, a matter that troubled some States prior to HAVA's enactment. See, *e.g.*, FEC Report on the NVRA to the 106th Congress 19 (1999).

Respondents and the dissent separately claim that the Failure-to-Vote Clause must be read to bar the use of nonvoting as a trigger for sending return cards because otherwise it would be "superfluous." *Post*, at 17 (opinion of BREYER, J.); see Brief for Respondents 29. After all, subsection (d) already prohibits States from removing registrants because of a failure to vote alone. See §20507(d)(1). To have meaning independent of subsection (d), respondents reason, the Failure-to-Vote Clause must prohibit other uses of the failure to vote, including its use as a trigger for sending out notices.

This argument is flawed because the Failure-to-Vote Clause has plenty of work to do under our reading. Most important, it prohibits the once-common state practice of removing registered voters simply because they failed to vote for some period of time. Not too long ago, "[c]ancellation for failure to vote [was] the principal means used . . . to purge the [voter] lists." Harris, Model Voter Registration System, at 44. States did not use a person's failure to vote as evidence that the person had died or moved but as an independent ground for removal. See

*ibid.*[4] Ohio was one such State. Its Constitution provided that "[a]ny elector who fails to vote in at least one election during any period of four consecutive years shall cease to be an elector unless he again registers to vote." Art. V, §1 (1977).

In addition, our reading prohibits States from using the failure to vote as the sole cause for removal on *any* ground, not just because of a change of residence. Recall that subsection (d)'s removal process applies only to change-of-residence removals but that the Failure-to-Vote Clause applies to *all* removals. Without the Failure-to-Vote Clause, therefore, States could use the failure to vote as conclusive evidence of ineligibility for some reason other than change of residence, such as death, mental incapacity, or a criminal conviction resulting in prolonged imprisonment.

D

Respondents put forth one additional argument regarding the Failure-to-Vote Clause. In essence, it boils down to this. So many properly registered voters simply discard return cards upon receipt that the failure to send them back is worthless as evidence that the addressee has moved. As respondents' counsel put it at argument, "a notice that doesn't get returned" tells the State "absolutely nothing about whether the person has moved." Tr. of Oral Arg. 41, 58. According to respondents, when Ohio removes registrants for failing to respond to a notice and failing to vote, it functionally "removes people solely for non-voting" unless the State has additional "reliable evidence" that a registrant has moved. *Id.*, at 49, 71.

This argument is based on a dubious empirical conclu-

———————

[4] See, *e.g.,* Haw. Rev. Stat. §11–17(a) (1993); Idaho Code Ann. §34–435 (1981); Minn. Stat. §201.171 (1992); Mont. Code Ann. §13–2–401(1) (1993); N. J. Stat. Ann. §19:31–5 (West Supp. 1989); Okla. Stat., Tit. 26, §4–120.2 (1991); Utah Code §20–2–24(1)(b) (1991).

sion that the NVRA and HAVA do not allow us to indulge. Congress clearly did not think that the failure to send back a return card was of no evidentiary value because Congress made that conduct one of the two requirements for removal under subsection (d).

Requiring additional evidence not only second-guesses the congressional judgment embodied in subsection (d)'s removal process, but it also second-guesses the judgment of the Ohio Legislature as expressed in the State's Supplemental Process. The Constitution gives States the authority to set the qualifications for voting in congressional elections, Art. I, §2, cl. 1; Amdt. 17, as well as the authority to set the "Times, Places and Manner" to conduct such elections in the absence of contrary congressional direction, Art. I, §4, cl. 1. We have no authority to dismiss the considered judgment of Congress and the Ohio Legislature regarding the probative value of a registrant's failure to send back a return card. See *Inter Tribal*, 570 U. S., at 16–19; see also *id.*, at 36–37 (THOMAS, J., dissenting); *id.*, at 42–43, 46 (ALITO, J., dissenting).

For all these reasons, we hold that Ohio law does not violate the Failure-to-Vote Clause.

## III

We similarly reject respondents' argument that Ohio violates other provisions of the NVRA and HAVA.

### A

Respondents contend that Ohio removes registered voters on a ground not permitted by the NVRA. They claim that the NVRA permits the removal of a name for only a few specified reasons—a person's request, criminal conviction, mental incapacity, death, change of residence, and initial ineligibility. Brief for Respondents 25–26; see 52 U. S. C. §§20507(a)(3), (4).[5] And they argue that Ohio

––––––––
[5] We assume for the sake of argument that Congress has the constitu-

removes registrants for other reasons, namely, for failing to respond to a notice and failing to vote.

This argument plainly fails. Ohio simply treats the failure to return a notice and the failure to vote as evidence that a registrant has moved, not as a ground for removal. And in doing this, Ohio simply follows federal law. Subsection (d), which governs removals "on the ground that the registrant has changed residence," treats the failure to return a notice and the failure to vote as evidence that this ground is satisfied. §20507(d)(1).

If respondents' argument were correct, then it would also be illegal to remove a name under §20507(c) because that would constitute removal for submitting change-of-address information to the Postal Service. Likewise, if a State removed a name after receiving a death certificate or a judgment of criminal conviction, that would be illegal because receipt of such documents is not listed as a permitted ground for removal under §20507(a)(3) or §20507(a)(4). About this argument no more need be said.

B

Respondents maintain, finally, that Ohio's procedure is illegal because the State sends out notices without having any "reliable indicator" that the addressee has moved. Brief for Respondents 31. The "[f]ailure to vote for a mere two-year period," they argue, does not reliably "indicate that a registrant has moved out of the jurisdiction." *Id.*, at 30; see also, *e.g.*, Brief for State of New York et al. as *Amici Curiae* 13–28.

This argument also fails. The degree of correlation between the failure to vote for two years and a change of residence is debatable, but we know from subsection (d) that Congress thought that the failure to vote for a period

––––––––––

tional authority to limit voting eligibility requirements in the way respondents suggest.

of two consecutive general elections was a good indicator of change of residence, since it made nonvoting for that period an element of subsection (d)'s requirements for removal. In a similar vein, the Ohio Legislature apparently thought that nonvoting for two years was sufficiently correlated with a change of residence to justify sending a return card.

What matters for present purposes is not whether the Ohio Legislature overestimated the correlation between nonvoting and moving or whether it reached a wise policy judgment about when return cards should be sent. For us, all that matters is that no provision of the NVRA prohibits the legislature from implementing that judgment. Neither subsection (d) nor any other provision of the NVRA demands that a State have some particular quantum of evidence of a change of residence before sending a registrant a return card. So long as the trigger for sending such notices is "uniform, nondiscriminatory, and in compliance with the Voting Rights Act," §20507(b)(1), States can use whatever plan they think best. That may be why not even the Sixth Circuit relied on this rationale.

Respondents attempt to find support for their argument in subsection (c), which allows States to send notices based on Postal Service change-of-address information. This provision, they argue, implicitly sets a minimum reliability requirement. Thus, they claim, a State may not send out a return card unless its evidence of change of residence is at least as probative as the information obtained from the Postal Service. See Tr. of Oral Arg. 56.

Nothing in subsection (c) suggests that it is designed to play this role. Subsection (c) says that "[a] State may meet" its obligation "to remove the names" of ineligible voters on change-of-residence grounds by sending notices to voters who are shown by the Postal Service information to have moved, but subsection (c) does not even hint that it imposes any sort of minimum reliability requirement for

sending such notices. §§20507(a)(4), (c). By its terms, subsection (c) simply provides one way—the minimal way—in which a State "*may* meet the [NVRA's] require-ment[s]" for change-of-residence removals. §20507(c) (emphasis added). As respondents agreed at argument, it is not the only way. Tr. of Oral Arg. 53.

C

Nothing in the two dissents changes our analysis of the statutory language.

1

Despite its length and complexity, the principal dissent sets out only two arguments. See *post*, at 7–8 (opinion of BREYER, J.). The first is one that we have already dis-cussed at length, namely, that the Failure-to-Vote Clause prohibits any use of the failure to vote except as permitted by subsections (c) and (d). We have explained why this argument is insupportable, *supra*, at 12–16, and the dis-sent has no answer to any of the problems we identify.

The dissent's only other argument is that Ohio's process violates §20507(a)(4), which requires States to make a "reasonable effort" to remove the names of ineligible voters from the rolls. The dissent thinks that this provision authorizes the federal courts to go beyond the restrictions set out in subsections (b), (c), and (d) and to strike down any state law that does not meet their own standard of "reasonableness." But see Brief for United States as *Amicus Curiae* 28–29. The dissent contends that Ohio's system violates this supposed "reasonableness" require-ment primarily because it relies on the failure to mail back the postcard sent to those who have not engaged in voter activity for two years. Based on its own cobbled-together statistics, *post*, at 12–13, and a feature of human nature of which the dissent has apparently taken judicial notice (*i.e.*, "the human tendency not to send back cards received

in the mail," *post*, at 13), the dissent argues that the fail-
ure to send back the card in question "has no tendency to
reveal accurately whether the registered voter has
changed residences"; it is an "irrelevant factor" that
"shows nothing at all that is statutorily significant." *Post*,
at 13–14, 17.

Whatever the meaning of §20507(a)(4)'s reference to
reasonableness, the principal dissent's argument fails
since it is the federal NVRA, not Ohio law, that attaches
importance to the failure to send back the card.  See
§§20507(d)(1)(B)(i), (d)(2)(A).  The dissenters may not
think that the failure to send back the card means any-
thing, but that was not Congress's view.  The NVRA plainly
reflects Congress's judgment that the failure to send back
the card, coupled with the failure to vote during the period
covering the next two general federal elections, is signifi-
cant evidence that the addressee has moved.

It is not our prerogative to judge the reasonableness of
that congressional judgment, but we note that, whatever
the general "human tendency" may be with respect to
mailing back cards received in the mail, the notice sent
under subsection (d) is nothing like the solicitations for
commercial products or contributions that recipients may
routinely discard.  The notice in question here warns
recipients that unless they take the simple and easy step
of mailing back the preaddressed, postage prepaid card—
or take the equally easy step of updating their information
online—their names may be removed from the voting rolls
if they do not vote during the next four years.  See Record
295–296, 357.  It was Congress's judgment that a reasona-
ble person with an interest in voting is not likely to ignore
notice of this sort.

2

JUSTICE SOTOMAYOR's dissent says nothing about what
is relevant in this case—namely, the language of the

NVRA—but instead accuses us of "ignor[ing] the history of voter suppression" in this country and of "uphold[ing] a program that appears to further the . . . disenfranchisement of minority and low-income voters." *Post*, at 5. Those charges are misconceived.

The NVRA prohibits state programs that are discriminatory, see §20507(b)(1), but respondents did not assert a claim under that provision. And JUSTICE SOTOMAYOR has not pointed to any evidence in the record that Ohio instituted or has carried out its program with discriminatory intent.

\*   \*   \*

The dissents have a policy disagreement, not just with Ohio, but with Congress. But this case presents a question of statutory interpretation, not a question of policy. We have no authority to second-guess Congress or to decide whether Ohio's Supplemental Process is the ideal method for keeping its voting rolls up to date. The only question before us is whether it violates federal law. It does not.

The judgment of the Sixth Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–980

_____

## JON HUSTED, OHIO SECRETARY OF STATE, PETITIONER *v.* A. PHILIP RANDOLPH INSTITUTE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 11, 2018]

THOMAS, J., concurring.

I join the Court's opinion in full. I write separately to add that respondents' proposed interpretation of the National Voter Registration Act (NVRA) should also be rejected because it would raise significant constitutional concerns.

Respondents would interpret the NVRA to prevent States from using failure to vote as evidence when deciding whether their voting qualifications have been satisfied. Brief for Respondents 25–30. The Court's opinion explains why that reading is inconsistent with the text of the NVRA. See *ante,* at 7–18. But even if the NVRA were "susceptible" to respondents' reading, it could not prevail because it "raises serious constitutional doubts" that the Court's interpretation avoids. *Jennings* v. *Rodriguez,* 583 U. S. ___, ___ (2018) (slip op., at 2).

As I have previously explained, constitutional text and history both "confirm that States have the exclusive authority to set voter qualifications and to determine whether those qualifications are satisfied." *Arizona* v. *Inter Tribal Council of Ariz., Inc.,* 570 U. S. 1, 29 (2013) (THOMAS, J., dissenting). The Voter-Qualifications Clause provides that, in elections for the House of Representatives, "the Electors in each State shall have the Qualifica-

tions requisite for Electors of the most numerous Branch of the State Legislature." U. S. Const., Art. I, §2, cl. 1. The Seventeenth Amendment imposes an identical requirement for elections of Senators. And the Constitution recognizes the authority of States to "appoint" Presidential electors "in such Manner as the Legislature thereof may direct." Art. II, §1, cl. 2; see *Inter Tribal Council of Ariz.*, 570 U. S., at 35, n. 2 (opinion of THOMAS, J.). States thus retain the authority to decide the qualifications to vote in federal elections, limited only by the requirement that they not "'establish special requirements'" for congressional elections "'that do not apply in elections for the state legislature.'" *Id.*, at 26 (quoting *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S. 779, 865 (1995) (THOMAS, J., dissenting)). And because the power to establish requirements would mean little without the ability to enforce them, the Voter Qualifications Clause also "gives States the authority . . . to verify whether [their] qualifications are satisfied." 570 U. S., at 28.

Respondents' reading of the NVRA would seriously interfere with the States' constitutional authority to set and enforce voter qualifications. To vote in Ohio, electors must have been a state resident 30 days before the election, as well as a resident of the county and precinct where they vote. Ohio Rev. Code Ann. §3503.01(A) (Lexis 2015); see also Ohio Const., Art. V, §1. Ohio uses a record of nonvoting as one piece of evidence that voters no longer satisfy the residence requirement. Reading the NVRA to bar Ohio from considering nonvoting would therefore interfere with the State's "authority to verify" that its qualifications are met "in the way it deems necessary." *Inter Tribal Council of Ariz., supra,* at 36. Respondents' reading thus renders the NVRA constitutionally suspect and should be disfavored. See *Jennings, supra*, at ___ (slip op., at 2).

Respondents counter that Congress' power to regulate

the "Times, Places and Manner" of holding congressional elections includes the power to impose limits on the evidence that a State may consider when maintaining its voter rolls. See Brief for Respondents 51–55; see also Art. I, §4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators"). But, as originally understood, the Times, Places and Manner Clause grants Congress power "only over the 'when, where, and how' of holding congressional elections," not over the question of who can vote. *Inter Tribal Council of Ariz.*, *supra,* at 29 (opinion of THOMAS, J.) (quoting T. Parsons, Notes of Convention Debates, Jan. 16, 1788, in 6 Documentary History of the Ratification of the Constitution 1211 (J. Kaminski & G. Saladino eds. 2000) (Massachusetts ratification delegate Sedgwick)). The "'Manner of holding Elections'" was understood to refer to "the circumstances under which elections were held and the mechanics of the actual election." 570 U. S., at 30 (quoting Art. I, §4, cl. 1). It does not give Congress the authority to displace state voter qualifications or dictate what evidence a State may consider in deciding whether those qualifications have been met. See 570 U. S., at 29–33. The Clause thus does not change the fact that respondents' reading of the NVRA is constitutionally suspect.

The Court's interpretation of the NVRA was already the correct reading of the statute: The NVRA does not prohibit a State from considering failure to vote as evidence that a registrant has moved. The fact that this reading avoids serious constitutional problems is an additional reason why, in my view, today's decision is undoubtedly correct.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–980

_____

## JON HUSTED, OHIO SECRETARY OF STATE, PETITIONER *v.* A. PHILIP RANDOLPH INSTITUTE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 11, 2018]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

Section 8 of the National Voter Registration Act of 1993 requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . a change in the residence of the registrant." §8(a)(4), 107 Stat. 82–83, 52 U. S. C. §20507(a)(4). This case concerns the State of Ohio's change-of-residence removal program (called the "Supplemental Process"), under which a registered voter's failure to vote in a single federal election begins a process that may well result in the removal of that voter's name from the federal voter rolls. See *infra*, at 7. The question is whether the Supplemental Process violates §8, which prohibits a State from removing registrants from the federal voter roll "by reason of the person's failure to vote." §20507(b)(2). In my view, Ohio's program does just that. And I shall explain why and how that is so.

## I

This case concerns the manner in which States maintain federal voter registration lists. In the late 19th and early 20th centuries, a number of "[r]estrictive registration laws and administrative procedures" came into use across the

United States—from literacy tests to the poll tax and from strict residency requirements to "selective purges." H. R. Rep. No. 103–9, p. 2 (1993). Each was designed "to keep certain groups of citizens from voting" and "discourage participation." *Ibid.* By 1965, the Voting Rights Act abolished some of the "more obvious impediments to registration," but still, in 1993, Congress concluded that it had "unfinished business" to attend to in this domain. *Id.,* at 3. That year, Congress enacted the National Voter Registration Act "to protect the integrity of the electoral process," "increase the number of eligible citizens who register to vote in elections for Federal office," and "ensure that accurate and current voter registration rolls are maintained." §20501(b). It did so mindful that "the purpose of our election process is not to test the fortitude and determination of the voter, but to discern the will of the majority." S. Rep. No. 103–6, p. 3 (1993).

In accordance with these aims, §8 of the Registration Act sets forth a series of requirements that States must satisfy in their "administration of voter registration for elections for Federal office." §20507. Ohio's Supplemental Process fails to comport with these requirements; it erects needless hurdles to voting of the kind Congress sought to eliminate by enacting the Registration Act. Four of §8's provisions are critical to this case: subsections (a), (b), (c), and (d). The text of each subsection is detailed and contains multiple parts. Given the complexity of the statute, readers should consult these provisions themselves (see Appendix A, *infra,* at 21–24) and try to keep the thrust of those provisions in mind while reading this opinion. At the outset, I shall address each of them.

## A

### 1

We begin with subsection (a)'s "Reasonable Program" requirement. That provision says that "each State shall":

"conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)." §20507(a)(4).

This provision tells each State that it must try to remove ineligible voters from the rolls, that it must act reasonably in doing so, and that, when it does so, it must follow the rules contained in the next three subsections of §8—namely, subsections (b), (c), and (d).

2

Subsection (b)'s "Failure-to-Vote" Clause generally forbids state change-of-residence removal programs that rely upon a registrant's failure to vote as a basis for removing the registrant's name from the federal voter roll. Before 1993, when Congress enacted this prohibition, many States would assume a registered voter had changed his address, and consequently remove that voter from the rolls, simply because the registrant had failed to vote. Recognizing that many registered voters who do not vote "may not have moved," S. Rep. No. 103–6, at 17, Congress consequently prohibited States from using the failure to vote as a proxy for moving and thus a basis for purging the voter's name from the rolls. The Failure-to-Vote Clause, as originally enacted, said:

"Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote." 107 Stat. 83; see §20507(b)(2).

As I shall discuss, Congress later clarified that "using

the procedures described in subsections (c) and (d) to remove an individual" from the federal voter roll is permissible and does not violate the Failure-to-Vote Clause. See §8(b)(2) of the National Voter Registration Act, 107 Stat. 83, and as amended, 116 Stat. 1728, 52 U. S. C. §20507(b)(2).

3

Subsection (c), which is entitled "Voter Removal Programs," explains how "[a] State may meet the requirement of subsection (a)(4)." §20507(c)(1). Because subsection (a)(4) itself incorporates all of the relevant requirements of subsections (b), (c), and (d) within it, see §20507(a)(4), subsection (c) sets forth one way a State can comply with the basic requirements of §8 at issue in this case (including subsection (b)). A State's removal program qualifies under subsection (c) if the following two things are true about the program:

> "(A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and
>
> "(B) if it appears [that] the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address." §20507(c)(1).

The upshot is that subsection (c) explains one way a State may comply with subsection (a)'s Reasonable Program requirement without violating subsection (b)'s Failure-to-Vote prohibition. It is a roadmap that points to a two-step removal process. At step 1, States first *identify* registered voters whose addresses may have changed; here, subsection (c) points to one (but not the only) method a State may use to do so. At step 2, subsection (c) explains, States must "*confirm* the change of address" by using a special notice procedure, which is further described in

subsection (d).

### 4

Subsection (d) sets forth the final procedure, which Ohio refers to as the "Confirmation Procedure." Brief for Petitioner 7. The statute makes clear that a State must use the Confirmation Procedure to "confirm" a change of address in respect to any registered voter it initially identifies as someone who has likely changed addresses. It works as follows: the State must send the registrant identified as having likely moved a special kind of notice by forwardable mail. That notice must warn the registrant that his or her name will be removed from the voter roll unless the registrant either returns an attached card and confirms his or her current address in writing or votes in an election during the period covering the next two federal elections. In a sense, the notice a State is required to send as part of the Confirmation Procedure gives registered voters whom the State has identified as likely ineligible a "last chance" to correct the record before being removed from the federal registration list. The Confirmation Procedure is mandatory for all change-of-residence removals, regardless of the method the State uses to make its initial identification of registrants whose addresses may have changed. In particular, subsection (d) says:

> "A State shall not remove the name of a registrant from the official list of eligible voters . . . on the ground that the registrant has changed residence unless the registrant [either]—
> "(A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
> "(B)(i) has failed to respond to a notice described in [subsection (d)(2)]; and (ii) has not voted [in two subsequent federal elections]." §20507(d)(1).

Subsection (d)(2) then goes on to describe (in consider-able detail) the "last chance" notice the State must send to the registrant.  In particular, the notice must be sent by *forwardable* mail so that the notice will reach the regis-trant even if the registrant has changed addresses.  It must include a postage-prepaid, preaddressed "return card" that the registrant may send back to the State to confirm or correct the State's record of his or her current address.  And, the notice must warn the registrant that unless the card is returned, if the registrant does not vote in the next two federal elections, then his or her name will be removed from the list of eligible voters.

\*      \*      \*

In sum, §8 tells States the following:

- In general, establish a removal-from-registration program that "makes a reasonable effort" to remove voters who become ineligible because they change residences.
- Do not target registered voters for removal from the registration roll because they have failed to vote.  However, "using the procedures described in subsections (c) and (d) to remove an individual" from the federal voter roll is permissible and does not violate the Failure-to-Vote prohibition.
- The procedures described in subsections (c) and (d) consist of a two-step removal process in which at step 1, the State uses change-of-address infor-mation (which the State may obtain, for instance, from the Postal Service) to identify registrants whose addresses may have changed; and then at step 2, the State must use the mandatory "last chance" notice procedure described in subsection (d) to confirm the change of address.
- The "last chance" confirmation notice must be sent by forwardable mail.  It must also include a postage-

prepaid, preaddressed "return card" that the registrant may send back to the State verifying his or her current address. And it must warn the registrant that unless the card is returned, if the registrant does not vote in the next two federal elections, then his or her name will be removed from the list of eligible voters.

B

The Supplemental Process, Ohio's program for removing registrants from the federal rolls on the ground that the voter has changed his address, is much simpler. Each of Ohio's 88 boards of elections sends its version of subsection (d)'s "last chance" notice to those on a list "of individuals who, according to the board's records, have not engaged in certain kinds of voter activity"—including "casting a ballot"—for a period of "generally two years." Record 1507. Accordingly, each board's list can include registered voters who failed to vote in a single federal election. And anyone on the list who "continues to be inactive" by failing to vote for the next "four consecutive years, including two federal elections," and fails to respond to the notice is removed from the federal voter roll. *Id.,* at 1509. Under the Supplemental Process, a person's failure to vote is the sole basis on which the State identifies a registrant as a person whose address may have changed and the sole reason Ohio initiates a registered voter's removal using subsection (d)'s Confirmation Procedure.

II

Section 8 requires that Ohio's program "mak[e] a reasonable effort to remove" ineligible registrants from the rolls because of "a change in the residence of the registrant," and it must do so "in accordance with subsections (b), (c), and (d)." §20507(a)(4)(B). In my view, Ohio's program is unlawful under §8 in two respects. It first

violates subsection (b)'s Failure-to-Vote prohibition be-cause Ohio uses nonvoting in a manner that is expressly prohibited and not otherwise authorized under §8. In addition, even if that were not so, the Supplemental Process also fails to satisfy subsection (a)'s Reasonable Program requirement, since using a registrant's failure to vote is not a reasonable method for identifying voters whose registrations are likely invalid (because they have changed their addresses).

First, as to subsection (b)'s Failure-to-Vote Clause, recall that Ohio targets for removal registrants who fail to vote. In identifying registered voters who have likely changed residences by looking to see if those registrants failed to vote, Ohio's program violates subsection (b)'s express prohibition on "*[a]ny* State program or activity [that] result[s] in the removal" of a registered voter "by reason of the person's failure to vote." §20507(b)(2) (emphasis added). In my view, these words are most naturally read to prohibit a State from considering a registrant's failure to vote as part of any process "that is used to start, or has the effect of starting, a purge of the voter rolls." H. R. Rep. No. 103–9, at 15. In addition, Congress enacted the Failure-to-Vote Clause to prohibit "the elimination of names of voters from the rolls solely due to [a registrant's] failure to respond to a mailing." *Ibid.* But that is precisely what Ohio's Supplemental Process does. The program violates subsection (b)'s prohibition because under it, a registrant who fails to vote in a single federal election, fails to respond to a forwardable notice, and fails to vote for another four years may well be purged. Record 1508. If the registrant had voted at any point, the registrant would not have been removed. See *supra,* at 7; *infra*, at 11–14.

Ohio does use subsection (d)'s Confirmation Procedure, but that procedure alone does not satisfy §8's requirements. How do we know that Ohio's use of the Confirma-

tion Procedure alone cannot count as statutorily significant? The statute's basic structure along with its language makes clear that this is so.

In respect to language, §8 says that the function of subsection (d)'s Confirmation Procedure is "to *confirm* the change of address" whenever the State has already "identif[ied] registrants whose addresses may have changed." §§20507(c)(1)(A), (d)(2). The function of the Confirmation Procedure is *not* to make the initial identification of registrants whose addresses may have changed. As a matter of English usage, you cannot *confirm* that an event happened without already having some reason to believe at least that it might have happened. Black's Law Dictionary 298 (6th ed. 1990) (defining "confirm" as meaning "[t]o complete or establish that which was imperfect or uncertain").

Ohio, of course, says that it has a ground for believing that those persons they remove from the rolls have, in fact, changed their address, but the ground is the fact that the person did not vote—the very thing that the Failure-to-Vote Clause forbids Ohio to use as a basis for removing a registered voter from the registration roll.

In respect to structure, two statutory illustrations make clear what the word "confirm" already suggests, namely, that the Confirmation Procedure is a *necessary* but not a *sufficient* procedure for removing a registered voter from the voter roll. The first illustration of how the Confirmation Procedure is supposed to function appears in subsection (c), which describes a removal process under which the State first *identifies* registrants who have likely changed addresses and then "*confirm[s]*" that change of residence using the Confirmation Procedure and sending the required "last chance" notice. §20507(c)(1) (emphasis added). The identification method subsection (c) says a State may use is "change-of-address information supplied by the Postal Service." §20507(c)(1)(A). A person does not notify the Postal Service that he is moving unless he is

likely to move or has already moved. And, as the Registration Act says, "if it appears from change-of-address provided by the Postal Service that . . . the registrant has moved to a different residence not in the same registrar's jurisdiction," the State has a reasonable (hence acceptable) basis for "us[ing] the notice procedure described in subsection (d)(2) to confirm the change of address." §20507(c)(1)(B).

The second illustration of how the Confirmation Procedure is supposed to function appears in a portion of the statute I have not yet discussed—namely, §6 of the National Voter Registration Act, which sets out the rules for voter registration by mail. See §6, 107 Stat. 80, 52 U. S. C. §20505. In particular, §6(d), entitled "Undelivered Notices," says that, "[i]f a notice of the disposition of a mail voter registration application . . . is sent by *non*forwardable mail and is returned undelivered," at that point the State "may proceed in accordance with section 8(d)," namely, the Confirmation Procedure, and send the same "last chance" notice that I have just discussed. §20505(d) (emphasis added).

Note that §6(d) specifies a *non*forwardable mailing—and not a *forwardable* mailing, like one specified in §8(d). This distinction matters. Why? If a person moves, a forwardable mailing will be sent along (*i.e.,* "forwarded") to that person's new address; in contrast, a *non*forwardable mailing will not be forwarded to the person's new address but instead will be returned to the sender and marked "undeliverable." And so a *non*forwardable mailing that is returned to the sender marked "undeliverable" indicates that the intended recipient may have moved. After all, the Postal Service, as the majority points out, returns mail marked "undeliverable" if the intended recipient has moved—not if the person still lives at his old address. *Ante,* at 6, and n. 3.

Under §6(d), the Registration Act expressly endorses

*non*forwardable mailings as a reasonable method for
States to use at step 1 to identify registrants whose ad-
dresses may have changed *before* the State proceeds to
step 2 and sends the *forwardable* notice required under
subsection (d)'s Confirmation Procedure.    Specifically,
§6(d) explains that, if a State sends its registrants a mail-
ing by *non*forwardable mail (which States often do), and if
"[that mailing] is returned undelivered," the State has a
fairly good reason for believing that the person has moved
and therefore "may proceed in accordance with" §8(d) by
sending the "last chance" *forwardable* notice that the
Confirmation Procedure requires.  §20505(d).  In contrast
to a *non*forwardable notice that is returned undeliverable,
which tells the State that a registrant has likely moved, a
*forwardable* notice that elicits no response whatsoever
tells the State close to nothing at all.  That is because, as I
shall discuss, most people who receive confirmation notices
from the State simply do not send back the "return card"
attached to that mailing—whether they have moved or
not.

   In sum, §6(d), just like §§8(a) and 8(c), indicates that the
State, as an initial matter, must use a reasonable method
to identify a person who has likely moved and then must
send that person a confirmatory notice that will in effect
give him a "last chance" to remain on the rolls.  And these
provisions thus tend to deny, not to support, the majority's
suggestion that somehow sending a "last chance" notice is
itself a way (other than nonvoting) to identify someone
who has likely moved.

   I concede that some individuals who have, in fact,
moved do, in fact, send a return card back to the State
making clear that they have moved.  And some registrants
do send back a card saying that they have *not* moved.
Thus, the Confirmation Procedure will sometimes help
provide *confirmation* of what the initial identification
procedure is supposed to accomplish: finding registrants

who have probably moved.  But more often than not, the State fails to receive anything back from the registrant, and the fact that the State hears nothing from the registrant essentially proves nothing at all.

Anyone who doubts this last statement need simply consult figures in the record along with a few generally available statistics.  As a general matter, the problem these numbers reveal is as follows: Very few registered voters move outside of their county of registration.  But many registered voters fail to vote.  Most registered voters who fail to vote also fail to respond to the State's "last chance" notice.  And the number of registered voters who both fail to vote and fail to respond to the "last chance" notice exceeds the number of registered voters who move outside of their county each year.

Consider the following facts.  First, Ohio tells us that a small number of Americans—about 4% of *all* Americans— move outside of their county each year.  Record 376.  (The majority suggests the relevant number is 10%, *ante,* at 2, but that includes people who move within their county.) At the same time, a large number of American voters fail to vote, and Ohio voters are no exception.  In 2014, around 59% of Ohio's registered voters failed to vote.  See Brief for League of Women Voters et al. as *Amici Curiae* 16, and n. 12 (citing Ohio Secretary of State, 2014 Official Election Results).

Although many registrants fail to vote and only a small number move, under the Supplemental Process, Ohio uses a registrant's failure to vote to identify that registrant as a person whose address has likely changed.  The record shows that in 2012 Ohio identified about 1.5 million registered voters—nearly 20% of its 8 million registered voters—as likely ineligible to remain on the federal voter roll because they changed their residences.  Record 475.  Ohio then sent those 1.5 million registered voters subsubsection (d) "last chance" confirmation notices.  In response to

those 1.5 million notices, Ohio only received back about 60,000 return cards (or 4%) which said, in effect, "You are right, Ohio. I have, in fact, moved." *Ibid.* In addition, Ohio received back about 235,000 return cards which said, in effect, "You are *wrong*, Ohio, I have *not* moved." In the end, however, there were *more than 1,000,000 notices*—the vast majority of notices sent—to which Ohio received back *no* return card at all. *Ibid.*

What about those registered voters—more than 1 million strong—who did not send back their return cards? Is there any reason at all (other than their failure to vote) to think they moved? The answer to this question must be no. There is no reason at all. First, those 1 million or so voters accounted for about 13% of Ohio's voting population. So if those 1 million or so registered voters (or even half of them) had, in fact, moved, then vastly more people must move each year in Ohio than is generally true of the roughly 4% of *all* Americans who move to a different county nationwide (not all of whom are registered voters). See *Id.*, at 376. But there is no reason to think this. Ohio offers no such reason. And the streets of Ohio's cities are not filled with moving vans; nor has Cleveland become the Nation's residential moving companies' headquarters. Thus, I think it fair to assume (because of the human tendency not to send back cards received in the mail, confirmed strongly by the actual numbers in this record) the following: In respect to change of residence, the failure of more than 1 million Ohio voters to respond to *forwardable notices* (the vast majority of those sent) shows nothing at all that is statutorily significant.

To put the matter in the present statutory context: When a State relies upon a registrant's failure to vote to initiate the Confirmation Procedure, it violates the Failure-to-Vote Clause, and a State's subsequent use of the Confirmation Procedure cannot save the State's program from that defect. Even if that were not so, a nonreturned con-

firmation notice adds nothing to the State's understanding of whether the voter has moved or not. And that, I repeat, is because a nonreturned confirmation notice (as the numbers show) cannot reasonably indicate a change of address.

Finally, let us return to §8's basic mandate and purpose. Ohio's program must "mak[e] *a reasonable effort* to remove the names of ineligible voters" from its federal rolls on change-of-residence grounds. §20507(a)(4) (emphasis added). Reasonableness under §8(a) is primarily measured in terms of the program's compliance with "subsections (b), (c), and (d)." §20507(a)(4)(B). That includes the broad prohibition on removing registrants because of their failure to vote. More generally, the statute seeks to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." §§20501(b)(3), (4). Ohio's system adds to its non-voting-based identification system a factor that has no tendency to reveal accurately whether the registered voter has changed residences. Nothing plus one is still one. And, if that "one" consists of a failure to vote, then Ohio's program also fails to make the requisite "reasonable effort" to comply with subsection (a)'s statutory mandate. It must violate the statute.

## III

The majority tries to find support in two provisions of a different statute, namely, the Help America Vote Act of 2002, 116 Stat. 1666, the pertinent part of which is reprinted in Appendix B, *infra*, at 25–26. The first is entitled "Clarification of Ability of Election Officials To Remove Registrants From Official List of Voters on Grounds of Change of Residence." §903, *id.,* at 1728. That provision was added to the National Voter Registration Act's Failure-to-Vote Clause, subsection (b)(2), which says that a State's registrant removal program "shall not result in the removal of the name of any person from the official list

. . . by reason of the person's failure to vote." §20507(b)(2); see *supra,* at 3. The "Clarification" adds:

> "except that nothing in this paragraph may be construed to prohibit a State *from using the procedures described in subsections (c) and (d)* to remove an individual from the official list of eligible voters if the individual—(A) has not either notified the applicable registrar (in person or in writing) or responded . . . to the [confirmation] notice sent by the applicable registrar; and then (B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office." §903, *id.,* at 1728 (emphasis added).

This amendment simply clarified that the use of nonvoting specified in subsections (c) and (d) does not violate the Failure-to-Vote Clause. The majority asks why, if the matter is so simple, Congress added the new language at all. The answer to this question is just what the title attached to the new language says, namely, Congress added the new language for purposes of *clarification.* And the new language clarified any confusion States may have had about the relationship between, on the one hand, subsection (b)'s broad prohibition on any use of a person's failure to vote in removal programs and, on the other hand, the requirement in subsections (c) and (d) that a State consider whether a registrant has failed to vote at the end of the Confirmation Procedure. This reading finds support in several other provisions in both the National Voter Registration Act and the Help America Vote Act, which make similar clarifications. See, *e.g.*, §20507(c)(2)(B) (clarifying that a particular prohibition "shall not be construed to preclude" States from complying with separate statutory obligations); see also §§20510(d)(2) (similar rule of construction), 21081(c)(1), 21083(a)(1)(B), (a)(2)(A)(iii), (b)(5), (d)(1)(A)–(B); 21084.

The majority also points out that another provision of

the Help America Vote Act, §303. See §303(a)(4), 116 Stat. 1708, 52 U. S. C. §21083(a)(4). That provision once again reaffirms that a State's registration list-maintenance program must "mak[e] a *reasonable effort* to remove registrants who are ineligible to vote" and adds that "*consistent with the National Voter Registration Act of 1993* . . . registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed *solely* by reason of a failure to vote." §21083(a)(4)(A) (emphasis added).

The majority tries to make much of the word "solely." But the majority makes too much of too little. For one thing, the Registration Act's Failure-to-Vote Clause under subsection (b) does not use the word "solely." And §303 of the Help America Vote Act tells us to interpret its language (which includes the word "solely") "consistent with the" Registration Act. §21083(a)(4)(A). For another, the Help America Vote Act says that "nothing in this [Act] may be construed to authorize or require conduct prohibited under [the National Voter Registration Act], or to supersede, restrict or limit the application of . . . [t]he National Voter Registration Act." §21145(a)(4).

The majority's view of the statute leaves the Registration Act's Failure-to-Vote Clause with nothing to do in respect to change-of-address programs. Let anyone who doubts this read subsection (d) (while remaining aware of the fact that it requires the sending of a confirmation notice) and ask himself or herself: What *else* is there for the Failure-to-Vote Clause to do? The answer is nothing. Section 8(d) requires States to send a confirmation notice for all change-of-address removals, and, in the majority's view, failing to respond to that forwardable notice is always a valid cause for removal, even if that notice was sent by reason of the registrant's initial failure to vote.

Thus the Failure-to-Vote Clause is left with no independent weight since complying with subsection (d) shields a State from violating subsection (b). To repeat the point, under the majority's view, the Failure-to-Vote Clause is superfluous in respect to change-of-address programs: subsection (d) already accomplishes everything the majority says is required of a State's removal program—namely, the sending of a notice.

Finally, even if we were to accept the majority's premise that the question here is whether Ohio's system removes registered voters from the registration list "solely by reason of a failure to vote," that would not change anything. As I have argued, Part II, *supra*, the failure to respond to a forwardable notice is an irrelevant factor in terms of what it shows about whether that registrant changed his or her residence. To add an irrelevant factor to a failure to vote, say, a factor like having gone on vacation or having eaten too large a meal, cannot change Ohio's sole use of "failure to vote" into something it is not.

IV

JUSTICE THOMAS, concurring, suggests that my reading of the statute "'raises serious constitutional doubts.'" *Ante*, at 1 (quoting *Jennings* v. *Rodriguez*, 583 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 2)). He believes that it "would seriously interfere with the States' constitutional authority to set and enforce voter qualifications." *Ante*, at 2. At the same time, the majority "assume[s]" that "Congress has the constitutional authority to limit voting eligibility requirements in the way respondents suggest." *Ante*, at 16, n. 5. But it suggests possible agreement with JUSTICE THOMAS, for it makes this assumption only "for the sake of argument." *Ibid.*

Our cases indicate, however, that §8 neither exceeds Congress' authority under the Elections Clause, Art. I, §4, nor interferes with the State's authority under the Voter

Qualification Clause, Art. 1, §2. Indeed, this Court's precedents interpreting the scope of congressional authority under the Elections Clause make clear that Congress has the constitutional power to adopt the statute before us.

The Elections Clause states:

> "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U. S. Const., Art. I, §4, cl. 1.

The Court has frequently said that "[t]he Clause's substantive scope is broad," and that it "empowers Congress to pre-empt state regulations governing the 'Times, Places and Manner' of holding congressional elections." *Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U. S. 1, 8 (2013). We have long held that "[t]he power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith.'" *Id.*, at 9 (quoting *Ex parte Siebold*, 100 U. S. 371, 392 (1880)).

The words "'Times, Places, and Manner,'" we have said, are "'comprehensive words'" that "'embrace authority to provide a complete code for congressional elections.'" *Tribal Council*, *supra,* at 8–9 (quoting *Smiley* v. *Holm*, 285 U. S. 355, 366 (1932)). That "complete code" includes the constitutional authority to enact "regulations relating to 'registration.'" *Ibid.*; see also *Cook* v. *Gralike*, 531 U. S. 510, 524 (2001) (same); *Roudebush* v. *Hartke*, 405 U. S. 15, 24–25 (1972). That is precisely what §8 does.

Neither does §8 tell the States "*who* may vote in" federal elections. *Tribal Council*, 570 U. S.*,* at 16. Instead, §8 considers the *manner* of registering those whom the State

itself considers qualified. Unlike the concurrence, I do not read our precedent as holding to the contrary. But see *id.*, at 26 (THOMAS, J., dissenting). And, our precedent strongly suggests that, given the importance of voting in a democracy, a State's effort (because of failure to vote) to remove from a federal election roll those it considers otherwise qualified is unreasonable. Cf. *Carrington* v. *Rash*, 380 U. S. 89, 91–93, 96 (1965) (State can impose "reasonable residence restrictions on the availability of the ballot" but cannot forbid otherwise qualified members of military to vote); see also *Kramer* v. *Union Free School Dist. No. 15*, 395 U. S. 621, 625 (1969) ("States have the power to impose *reasonable* citizenship, age, and residency requirements on the availability of the ballot" (emphasis added)); *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663, 668 (1966) ("To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor").

For these reasons, with respect, I dissent.

APPENDIXES

A

*The National Voter Registration Act of 1993*

**"SEC. 2. FINDINGS AND PURPOSES.**

"(a) FINDINGS.—The Congress finds that—

"(1) The right of citizens of the United States to vote is a fundamental right;

"(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

"(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation . . . , including racial minorities.

"(b) PURPOSES.—The purposes of this Act are—

"(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

"(2) to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

"(3) to protect the integrity of the electoral process; and

"(4) to ensure that accurate and current voter registration rolls are maintained."  107 Stat. 77.

**"SEC. 5.  SIMULTANEOUS APPLICATION FOR VOTER REGISTRATION AND APPLICATION FOR MOTOR VEHICLE DRIVER'S LICENSE.**

"(d) CHANGE OF ADDRESS.—Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant in-

volved unless the registrant states on the form that the change of address is not for voter registration purposes." *Id.,* at 79.

## "SEC. 6. MAIL REGISTRATION.

"(d) UNDELIVERED NOTICES. If a notice of the disposition of a mail voter registration application under section 8(a)(2) is sent by nonforwardable mail and is returned undelivered, the registrar may proceed in accordance with section 8(d)." *Id.,* at 80.

## "SEC. 8. REQUIREMENTS WITH RESPECT TO ADMINI-STRATION OF VOTER REGISTRATION.

"(a) IN GENERAL—In the administration of voter registration for elections for Federal office, each State shall—

"(1) ensure that any eligible applicant is registered to vote in an election—

.          .          .          .          .

"(2) require the appropriate State election official to send notice to each applicant of the disposition of the application;

"(3) provide that the name of a registrant may not be removed from the official list of eligible voters except—

"(A) at the request of the registrant;

"(B) as provided by State law, by reason of criminal conviction or mental incapacity; or

"(C) as provided under paragraph (4);

"(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—

"(A) the death of the registrant; or

"(B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

.          .          .          .          .

"(b) CONFIRMATION OF VOTER REGISTRATION.—Any State program or activity to protect the integrity of the

electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—

"(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U. S. C. 1973 et seq.); and

"(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote.

"(c) VOTER REMOVAL PROGRAMS.—(1) A State may meet the requirement of subsection (a)(4) by establishing a program under which—

"(A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

"(B) if it appears from information provided by the Postal Service that—

"(i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

"(ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

"(2)(A) A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

"(B) Subparagraph (A) shall not be construed to pre-

Appendix A to opinion of BREYER, J.

clude—

"(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

"(ii) correction of registration records pursuant to this Act.

"(d) REMOVAL OF NAMES FROM VOTING ROLLS.—"(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—

"(A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

"(B)(i) has failed to respond to a notice described in paragraph (2); and

"(ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

"(2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

"(A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second

general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

"(B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

"(3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection." *Id.,* at 82–84.

# B

## *The Help America Vote Act of 2002*

**"SEC. 303. COMPUTERIZED STATEWIDE VOTER REGISTRATION LIST REQUIREMENTS AND REQUIRE-MENTS FOR VOTERS WHO REGISTER BY MAIL.**

"(a) COMPUTERIZED STATEWIDE VOTER REGISTRATION LIST REQUIREMENTS.—

.          .          .          .          .

"(4) MINIMUM STANDARD FOR ACCURACY OF STATE VOTER REGISTRATION RECORDS.—The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including the following:

"(A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, consistent with the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.), registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote.

"(B) Safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 116 Stat. 1708–1710.

**"SEC. 903. CLARIFICATION OF ABILITY OF ELECTION OFFICIALS TO REMOVE REGISTRANTS FROM OFFICIAL LIST OF VOTERS ON GROUNDS OF CHANGE OF RESIDENCE.**

"Section 8(b)(2) of the National Voter Registration Act of 1993 . . . is amended by striking the period at the end and inserting the following: ", except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual—

"(A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

"(B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office." *Id.,* at 1728.

**"SEC. 906. NO EFFECT ON OTHER LAWS.**

"(a) IN GENERAL.— . . . [N]othing in this Act may be construed to authorize or require conduct prohibited under any of the following laws, or to supersede, restrict, or limit the application of such laws [including]:

.          .          .          .          .

"(4) The National Voter Registration Act of 1993." *Id.,* at 1729.

# SUPREME COURT OF THE UNITED STATES

————

No. 16–980

————

## JON HUSTED, OHIO SECRETARY OF STATE, PETITIONER *v.* A. PHILIP RANDOLPH INSTITUTE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 11, 2018]

JUSTICE SOTOMAYOR, dissenting.

I join the principal dissent in full because I agree that the statutory text plainly supports respondents' interpretation. I write separately to emphasize how that reading is bolstered by the essential purposes stated explicitly in the National Voter Registration Act of 1993 (NVRA) to increase the registration and enhance the participation of eligible voters in federal elections. 52 U. S. C. §§20501(b)(1)–(2). Congress enacted the NVRA against the backdrop of substantial efforts by States to disenfranchise low-income and minority voters, including programs that purged eligible voters from registration lists because they failed to vote in prior elections. The Court errs in ignoring this history and distorting the statutory text to arrive at a conclusion that not only is contrary to the plain language of the NVRA but also contradicts the essential purposes of the statute, ultimately sanctioning the very purging that Congress expressly sought to protect against.

Concerted state efforts to prevent minorities from voting and to undermine the efficacy of their votes are an unfortunate feature of our country's history. See *Schuette* v. *BAMN*, 572 U. S. 291, 337–338 (2014) (SOTOMAYOR, J., dissenting). As the principal dissent explains, "[i]n the late 19th and early 20th centuries, a number of

'[r]estrictive registration laws and administrative proce-
dures' came to use across the United States." *Ante,* at 1–2
(opinion of BREYER, J.).    States enforced "poll tax[es],
literacy tests, residency requirements, selective purges,
. . . and annual registration requirements," which were
developed "to keep certain groups of citizens from voting."
H. R. Rep. No. 103–9, p. 2 (1993).  Particularly relevant
here, some States erected procedures requiring voters to
renew registrations "whenever [they] moved or failed to
vote in an election," which "sharply depressed turnout,
particularly among blacks and immigrants."  A. Keyssar,
The Right To Vote 124 (2009).  Even after the passage of
the Voting Rights Act in 1965, many obstacles remained.
See *ante,* at 2 (opinion of BREYER, J.).

   Congress was well aware of the "long history of such list
cleaning mechanisms which have been used to violate the
basic rights of citizens" when it enacted the NVRA.
S. Rep. No. 103–6, p. 18 (1993).  Congress thus made clear
in the statutory findings that "the right of citizens of the
United States to vote is a fundamental right," that "it is
the duty of the Federal, State, and local governments to
promote the exercise of that right," and that "discrimina-
tory and unfair registration laws and procedures can have
a direct and damaging effect on voter participation . . . and
disproportionately harm voter participation by various
groups, including racial minorities."  52 U. S. C. §20501(a).
In light of those findings, Congress enacted the NVRA
with the express purposes of "increas[ing] the number of
eligible citizens who register to vote" and "enhanc[ing] the
participation of eligible citizens as voters."  §§20501(b)(1)–
(2).  These stated purposes serve at least in part to coun-
teract the history of voter suppression, as evidenced by
§20507(b)(2), which forbids "the removal of the name of
any person from the official list of voters registered to vote
in an election for Federal office by reason of the person's
failure to vote."  *Ibid.*

Of course, Congress also expressed other objectives, "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." §§20501(b)(3)–(4).* The statute contemplates, however, that States can, and indeed must, further all four stated objectives. As relevant here, Congress crafted the NVRA with the understanding that, while States are required to make a "reasonable effort" to remove ineligible voters from the registration lists, §20507(a)(4), such removal programs must be developed in a manner that "prevent[s] poor and illiterate voters from being caught in a purge system which will require them to needlessly re-register" and "prevent[s] abuse which has a disparate impact on minority communities," S. Rep. No. 103–6, at 18.

Ohio's Supplemental Process reflects precisely the type of purge system that the NVRA was designed to prevent. Under the Supplemental Process, Ohio will purge a registrant from the rolls after six years of not voting, *e.g.,* sitting out one Presidential election and two midterm elections, and after failing to send back one piece of mail, even though there is no reasonable basis to believe the individual actually moved. See *ante,* at 14 (BREYER, J., dissenting). This purge program burdens the rights of eligible voters. At best, purged voters are forced to "needlessly reregister" if they decide to vote in a subsequent election; at worst, they are prevented from voting at all because they never receive information about when and where

———————

*The majority characterizes these objectives as ones to "remov[e] ineligible persons from the States' voter registration rolls," *ante,* at 2, but maintaining "accurate" rolls and "protecting the integrity of the electoral process" surely encompass more than just removing ineligible voters. An accurate voter roll and fair electoral process should also reflect the continued enrollment of eligible voters. In this way, the NVRA's enhanced-participation and accuracy-maintenance goals are to be achieved simultaneously, and are mutually reinforcing.

elections are taking place.

It is unsurprising in light of the history of such purge programs that numerous *amici* report that the Supplemental Process has disproportionately affected minority, low-income, disabled, and veteran voters.  As one example, *amici* point to an investigation that revealed that in Hamilton County, "African-American-majority neighborhoods in downtown Cincinnati had 10% of their voters removed due to inactivity" since 2012, as "compared to only 4% of voters in a suburban, majority-white neighborhood."  Brief for National Association for the Advancement of Colored People et al. as *Amici Curiae* 18–19.  *Amici* also explain at length how low voter turnout rates, language-access problems, mail delivery issues, inflexible work schedules, and transportation issues, among other obstacles, make it more difficult for many minority, low-income, disabled, homeless, and veteran voters to cast a ballot or return a notice, rendering them particularly vulnerable to unwarranted removal under the Supplemental Process.  See Brief for Asian Americans Advancing Justice | AAJC et al. as *Amici Curiae* 15–26; Brief for National Disability Rights Network et al. as *Amici Curiae* 17, 21–24, 29–31; Brief for VoteVets Action Fund as *Amicus Curiae* 23–30.  See also Brief for Libertarian National Committee as *Amicus Curiae* 19–22 (burdens on principled nonvoters).

Neither the majority nor Ohio meaningfully dispute that the Supplemental Process disproportionately burdens these communities.  At oral argument, Ohio suggested that such a disparate impact is not pertinent to this case because respondents did not challenge the Supplemental Process under §20507(b)(1), which requires that any removal program "be uniform, nondiscriminatory, and in compliance with the Voting Rights Act."  Tr. of Oral Arg. 23.  The fact that respondents did not raise a claim under §20507(b)(1), however, is wholly irrelevant to our assessment of whether, as a matter of statutory interpretation,

the Supplemental Process removes voters "by reason of the person's failure to vote" in violation of §20507(b)(2). Contrary to the majority's view, *ante,* at 20–21, the NVRA's express findings and purpose are highly relevant to that interpretive analysis because they represent "the assumed facts and the purposes that the majority of the enacting legislature . . . had in mind, and these can shed light on the meaning of the operative provisions that follow." A. Scalia & B. Garner, Reading Law 218 (2012). Respondents need not demonstrate discriminatory intent to establish that Ohio's interpretation of the NVRA is contrary to the statutory text and purpose.

In concluding that the Supplemental Process does not violate the NVRA, the majority does more than just misconstrue the statutory text. It entirely ignores the history of voter suppression against which the NVRA was enacted and upholds a program that appears to further the very disenfranchisement of minority and low-income voters that Congress set out to eradicate. States, though, need not choose to be so unwise. Our democracy rests on the ability of all individuals, regardless of race, income, or status, to exercise their right to vote. The majority of States have found ways to maintain accurate voter rolls without initiating removal processes based solely on an individual's failure to vote. See App. to Brief for League of Women Voters of the United States et al. as *Amici Curiae* 1a–9a; Brief for State of New York et al. as *Amici Curiae* 22–28. Communities that are disproportionately affected by unnecessarily harsh registration laws should not tolerate efforts to marginalize their influence in the political process, nor should allies who recognize blatant unfairness stand idly by. Today's decision forces these communities and their allies to be even more proactive and vigilant in holding their States accountable and working to dismantle the obstacles they face in exercising the fundamental right to vote.